IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PAMELA BUTLER, | ) |
| | ) |
| *Plaintiffs*, | )  Case No. 4:18-cv-01701-AGF |
| v. | ) |
| | )  Lead Case |
| MALLINCKRODT, INC., et al. | ) |
| | )  **ORAL ARGUMENT REQUESTED** |
| *Defendants.* | ) |

**NOTICE OF JOINDER AND SUPPLEMENTAL MEMORANDUM BY
DEFENDANT COTTER CORPORATION (N.S.L.) TO MOTION TO
EXCLUDE, OR IN THE ALTERNATIVE, LIMIT
THE TESTIMONY OF PLAINTIFFS' EXPERT JAMES WELLS, PH.D.**

Defendant Cotter Corporation (N.S.L.) ("Cotter") joins and submits this supplemental memorandum in support of the motion to exclude or limit the testimony of Plaintiffs' Expert James Wells, Ph.D., filed by Mallinckrodt, Inc. ("Mallinckrodt"). In addition to the arguments and authorities raised by Mallinckrodt, Dr. Wells' opinions and bases as to Cotter do not satisfy the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for the following reasons:

**No Air Modeling Expertise.** As with Mallinckrodt, Dr. Wells goes far beyond his geologist expertise to offer air modeling opinions on Cotter's compliance with the federal regulatory effluent limits. (Mallinckrodt Mem. 17–19, Ex. A at 3.)

Dr. Wells readily admitted that he did not perform any modeling himself and instead tried to rely on *Mallinckrodt's expert's* air dispersion models. (Wells *Butler* 239:12–20.) He also conceded that in his other projects that required air modeling, he would "leave it to a modeler to actually construct and run the model." (Wells *Butler* 247:16–22.) Additionally, Dr. Wells did not, nor could he, verify the air models run by Mallinckrodt's actual air modeling experts on

1

whom Dr. Wells relied. (Wells *Butler* 313:7–16.) In fact, as Mallinckrodt's motion and experts explain, Dr. Wells' reliance on their work is riddled with errors. (Mallinckrodt Mem. 8–11, Ex. M.) This lack of qualified verification or testing nullifies the reliability of Dr. Wells' air modeling opinion. 509 U.S. at 593.

Under *Daubert*, Dr. Wells, a geologist, cannot stray from the scope of his expertise to offer unverified and unreliable air dispersion opinions against Cotter based on other experts' work. "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002); *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (2001) ("a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable").

**Erroneous Air Model.** Dr. Wells' lack of air modeling expertise becomes apparent in his failure to apply an accepted air dispersion modeling methodology or apply the methodology he chose correctly. Instead, Dr. Wells applied a "box model" used for enclosed spaces. (*See* Expert Report, Douglas Daugherty, Ph.D., PE, CIH, Ex. A at 14.) This box model assumed incorrectly that any emissions from Cotter's open-air drying operations at Latty Avenue would never rise above 10 meters and would be mixed solely with the air in the enclosed box shape of the model. (Wells *Butler* 314:8–11.)

But the shape of Cotter's open-air operations at Latty Avenue did not resemble an enclosed box. (Wells *Butler* 315:1–9.) Nor did Dr. Wells account for open-air characteristics, such as the temperature, the prevailing wind direction, the buoyancy of any plume, and the upward velocity on release from the dryer stack. (Wells *Butler* 315:11–16, 317:11–13, 335:20–

336:3.) And critically, the stack of Cotter's dryer itself rose to 9.1 meters, which Dr. Wells does not dispute. (*See* Ex. A at 14.) This fundamental error means that hot emissions from the dryer stack would rise—well above Dr. Wells' box-model height of 10 meters, because the emissions started and went up from 9.1 meters—and would then move downwind from the dryer at the prevailing wind direction in open air. (*See id.*) Dr. Wells' failure to apply accepted air dispersion modeling dooms his opinions as to Cotter. *See Daubert*, 509 U.S. at 593–94 (requiring the technique or theory to be "generally accepted in the scientific community"); *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 722 (8th Cir. 2015) (requiring experts to "employ[] the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (opinion resting on faulty or insufficient data or ignoring relevant data should be excluded).

Moreover, Dr. Wells acknowledged that he did not perform any validation on his use of the box model. (Wells *Butler* 315:15–316:3.) He defended his failure to use accepted air dispersion models by pointing to the *lack* of data supporting his calculations: "[W]hat we're trying to do is fill in data gaps, either temporal or spatial data gaps. . . . [W]e don't have a lot of measurements from the time that the dryer was operating of particulate concentrations at the fence line. As a matter of fact, I'm not aware of any." (*Id.*) But the lack of data does not somehow obviate the need to apply the right air models. (*See* Ex. A, pp. 9–17.) And the analytical gap between the actual facts in the record and Dr. Wells' flawed box model opinion requires its exclusion. *See Marmo v. Tyson Fresh Meats*, Inc., 457 F.3d 748, 758 (8th Cir. 2006).

**Flawed Air Modeling Opinions.** Not surprisingly, Dr. Wells also contradicted the sources he tried to rely on for his air modeling opinions. First, Dr. Wells misused a radon emission rate developed by Mallinckrodt's experts for SLAPS and applied the rate to Cotter's

3

operations at Latty Avenue. His calculations almost exclusively consisted of releases from K-65 drums, despite the fact *K-65 drums were not even present at Latty Avenue.* (Ex. A, p. 28.) Had Dr. Wells identified and corrected this error (as a qualified air modeling expert would), the resulting radon emission calculations at Latty Avenue would have been *173 times lower.* (*Id.*) Again, Dr. Wells' unreliable opinion simply does not match the actual facts and thus fails *Daubert*. *Marmo*, 457 F.3d at 758.

Second, Dr. Wells misused Mallinckrodt's expert report to conclude that Cotter had released certain radionuclide concentrations above the regulatory guidelines. But the report itself acknowledged that while the decrease in temperature of Cotter's drying operations in October 1970 "would result in lower emissions," that decrease was "not considered explicitly" in Mallinckrodt's expert analysis. (Ex. A, p. 20.) Again, if Dr. Wells were to apply that analysis reliably to the facts as a qualified air modeler (which he admittedly cannot do), he would have factored in the decreased temperature. He did not. Yet re-calculating the estimated emissions based on the lower dryer temperature reduces Dr. Wells' overstated emissions by approximately 10% and within the regulatory limit. (Ex. A, pp. 20–22.)

Dr. Wells' "unblinking reliance" on air modeling data in Mallinckrodt's expert report for air modeling opinions far beyond his expertise—and despite the report itself acknowledging that an accurate analysis should reduce the emissions—"demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results." *In re TMI Litig.*, 193 F.3d 613, 715 (3d Cir. 1999).

**Unreliable Allocation Opinions.** As for Dr. Wells' flawed allocation between Mallinckrodt and Cotter, Plaintiffs' counsel asked Dr. Wells "to make an assumption that the parties in this case, Mallinckrodt and Cotter, were or could be considered responsible for the

4

entire allocation from the respective sites." (Wells *Butler* 264:3–7.) This admission itself makes Dr. Wells' opinion irrelevant: the allocation excludes all other sources of radiation exposure. Dr. Wells also admitted that his apportionment between the two parties was not one "that relies on calculations." (Wells *Butler* 336:19–23.) In other words, Dr. Wells took a litigation-driven premise and reached a litigation-driven result without any scientific basis. This guesswork cannot survive a *Daubert* challenge. *See Lauzon v. Senco Prod.*, Inc., 270 F.3d 681, 687 (8th Cir. 2001) (*Daubert* considers "whether the expertise was developed for litigation or naturally flowed from the expert's research"); *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 786 (S.D. Tex. 2000) ("work[ing] backward" from conclusion to find scientific support is a practice that "cannot withstand *Daubert* scrutiny and is not due any credence in a court of law").

## CONCLUSION

At bottom, Dr. Wells is the sole Plaintiffs' expert offering air dispersion opinions, and yet Dr. Wells admits he is not an air modeler, fails to apply accepted air dispersion models, fails to account for the actual characteristics of the sites at issue, fails to make any attempt to characterize the atmospheric influences that would drive the dispersion of any air pollutants, misapplies the calculations of other experts in inappropriate and unreliable ways, and focuses on results dictated by litigation, not science. For these reasons, Cotter joins in Mallinckrodt's motion to exclude or limit the opinions and testimony of Plaintiffs' expert James Wells, Ph.D.

Dated:  August 18, 2021

Respectfully submitted,

*/s/ Brian O.  Watson*
Brian O.  Watson, #68678MO
Jennifer Steeve, #308082CA
Lauren E.  Jaffe, #6316795IL
RILEY SAFER HOLMES & CANCILA LLP
70 W.  Madison St., Ste.  2900
Chicago, Illinois 60602
(312) 471-8700 (main)
(312) 471-8701 (fax)
bwatson@rshc-law.com
jsteeve@rshc-law.com
ljaffe@rshc-law.com

ATTORNEYS FOR DEFENDANT
COTTER CORPORATION (N.S.L.)

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 18th day of August, 2021, I electronically filed the above with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

*/s/ Brian O. Watson*