EXHIBIT 1

## BUTLER VERSUS MALLINCKRODT

## EXPERT REPORT OF MALCOLM R. KNAPP, Ph.D.

### March 17, 2020

**Executive Summary**

This report evaluates whether the facility located on Latty Avenue in Hazelwood, Missouri met Atomic Energy Commission (AEC) regulations for releases of radioactive materials during the period that the Cotter Corporation (N.S.L.) (hereinafter referred to as Cotter) held a Source Material License by the AEC to possess uranium at that location, and whether Cotter and the AEC considered that the Latty Avenue site was properly decommissioned at the time the AEC terminated its license.

I am a private consultant who worked for 20 years for the Nuclear Regulatory Commission (NRC) (successor agency to the AEC), where my responsibilities included the regulation of radioactive materials and radioactive waste. I retired in 1999 as a Deputy Executive Director of that agency.  My evaluation is based on my extensive experience with health and safety issues associated with the regulation of radioactive materials and my review of contemporaneous documentation related to the Latty Avenue site.

Cotter was in compliance with AEC regulations as they applied to offsite releases of radiation and radioactive material while Cotter was the licensee at Latty Avenue, in particular the specific regulations, 10 CFR 20.105, "Permissible levels of radiation in unrestricted areas," and 10 CFR 20.106, "Radioactivity in effluents to unrestricted areas."

After reviewing the pertinent documents in the case, and based on my experience as a regulator and as a regulatory consultant, it also is my expert opinion that:

- Cotter was responsive to AEC's findings and recommendations and met or exceeded AEC requirements or expectations.

- The AEC did not find the Latty Avenue facility's releases to unrestricted areas to be in violation of 10 CFR 20.105 or 10 CFR 20.106 while Cotter was the licensee.  Further, I found no evidence that offsite releases from Latty Avenue during this period were in violation of these requirements.

- Subsequent to termination of the Latty Avenue license, NRC did not find any evidence of radioactive materials from Cotter's prior operations at Latty Avenue that posed a danger to the surrounding population.

- Cotter's disposal of the leached barium sulfate to a sanitary landfill did not violate any AEC regulations.

1

COTTERKNAPP00000001

Contrary to what is alleged in the Complaints[1], during the entire period Cotter was licensed to possess radioactive materials at Latty Avenue, there were federal regulations promulgated by the AEC that governed the permissible or maximum amount of radiation to which a member of the general public could be exposed.

I have reviewed the reports of Dr. James Wells[2, 3]. I have found that his analysis of thorium-230 releases from the Latty Avenue site contains a number of errors, and that when these errors are corrected, the thorium-230 concentrations in effluents from Latty Avenue were significantly less than the Part 20 airborne effluent limits for thorium-230 while Cotter was a licensee.

I found no evidence that Cotter ever violated AEC requirements with respect to either the amount of radiation to which a member of the general public could be exposed or releases of airborne or liquid radioactive material to the accessible environment.

**Introduction and Background**

This report evaluates whether Cotter met federal regulations for airborne and liquid releases of radioactive materials at its facility at Latty Avenue in Hazelwood, Missouri (hereinafter called Latty Avenue) during the period that Cotter was licensed by the AEC (from December 1969 through November 1974), and whether Cotter and AEC concluded that the Latty Avenue site was safely and properly decommissioned at the time the AEC terminated its license.

I retired from the Nuclear Regulatory Commission (NRC) in 1999 after twenty years of service. I retired as Deputy Executive Director for Regulatory Effectiveness, in which position I was responsible for all research, investigations, enforcement, and emergency response for the agency. Prior to that, I was Deputy Director of the Office of Nuclear Materials Safety and Safeguards (NMSS), the NRC headquarters organization responsible for the regulation of radioactive materials licensees (such as Cotter), nuclear fuel cycle facilities, radioactive waste, and security and safeguards. As Deputy Director of NMSS, I was a founding co-chair of the federal government's Interagency Steering Committee on Radiation Standards (ISCORS). I also spent about a year as Acting Director of NRC's Office of Research.

In 1994 and 1995, I served as Director of the Waste Management Division, where my responsibilities included high- and low-level radioactive waste management, uranium recovery, and decommissioning. In this role, I managed and participated in the regulation of materials facility and reactor site decommissioning at several sites.  My responsibilities included NRC's

---

[1] Paragraph 20 of the Complaints states, in part:
"During the entire period between 1969 and 1973, no federal regulations governed the permissible or maximum amount of radiation to which a member of the general public could be exposed."
[2] Expert Report of James T. Wells, PhD, PG, L. Everett & Associates, LLC. In the matter of: McClurg, et al. v. Mallinckrodt, Inc., et al., March 31, 2019.
[3] Supplemental Expert Report of James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: McClurg, et al. v. Mallinckrodt, Inc., et al., August 1, 2019.

COTTERKNAPP00000002

oversight activities in the West Valley Demonstration Project, in which the Department of Energy (DOE) remediated a nuclear fuel reprocessing facility.

From 1989 through 1992, I was the Director of the Division of Radiation Safety and Safeguards in NRC's Region I. There, I directly managed licensing, inspection, enforcement, and incident response for about 4,000 materials licensees, including hospitals, clinics, physicians, pharmaceutical manufacturers, large scale irradiators, radiographers, and gauge users. I also managed inspections for health physics and security for 32 commercial nuclear reactors. During that time, I conducted numerous enforcement conferences and personally managed responses to materials incidents. I often accompanied inspectors during facility inspections.  I had regional responsibility for the NUMEC nuclear fuel fabrication facility in Apollo, Pennsylvania, which had a number of similarities to the Latty Avenue site.

Much of my work in Region I involved NRC's 10 CFR Part 20, *Standards for Protection Against Radiation* (Part 20). My staff inspected facilities for safety and for compliance with Part 20 and wrote inspection reports documenting their findings. I directly managed NRC's actions following inspections in which significant safety issues or items of non-compliance with Part 20 were identified. NRC could use several regulatory tools for achieving compliance, including issuing Notices of Violation, conducting Enforcement Conferences (which I usually chaired for materials licensees), and issuing Orders and Civil Penalties. My understanding from my career at the NRC is that those same tools were in place before 1974 for the AEC and after 1974 for the NRC.

From 1979 through 1989, I was involved in the development of a number of NRC's regulations and guides. I was a principal author of the NRC's generic high-level waste disposal regulation, 10 CFR Part 60 (Part 60), and was responsible for developing and issuing 10 CFR Part 62, which concerns emergency access to low-level radioactive waste disposal facilities. My work on Part 60 included managing the development of the technical rationale for the regulation's main safety requirements and drafting and finalizing parts of the regulation. I was also a principal author of the NRC's responses to public comments on Part 60, including developing and documenting NRC's rationale for revising the regulation or keeping the original wording, as appropriate.

Prior to joining NRC in 1979, I worked for the General Electric Company, principally at Corporate Research and Development, where I investigated gas turbine corrosion, heavy water separation and continuous casting of copper rod. I also worked as a process engineer at a chrome processing plant operated by the Allied Chemical Corporation (now Honeywell), where my responsibilities included designing and testing ventilation systems used to protect employees from airborne toxic chemicals.

I hold B.E.S. and M.S.E. degrees from Johns Hopkins University and a Ph.D. from Carnegie-Mellon University. All my degrees are in Chemical Engineering. As part of my training at the NRC, I attended the NRC two-week Health Physics course and the Oak Ridge five-week Health Physics course.

COTTERKNAPP00000003

I am currently a Senior Nuclear Safety Consultant to Talisman International, LLC. I have been an independent consultant in nuclear safety and management since my retirement from the NRC in 1999. My consulting clients have included the NRC, the Los Alamos National Laboratory, the United States Department of Justice, DOE and the International Atomic Energy Agency, including working for the latter two agencies as a full-time employee for several months each.

From 2010 through mid-2013 I worked (as a Talisman consultant) for the Federal Authority for Nuclear Regulation (FANR) in the United Arab Emirates. That work included revising FANR's radiation safety regulation, which is comparable to NRC's Part 20, and writing a regulatory guide to help licensees comply with the regulation. I also revised FANR's enforcement procedure, wrote its materials violation instruction and eight practice-specific inspection instructions, developed the materials inspector training program, and trained FANR's materials inspectors.

My curriculum vitae is attached as Attachment A.

Talisman is paid a fee for my time at the rate of $440.00 per hour. During the past 4 years, I have been deposed once[4] but have not testified in court in any litigation.

This report is based upon my experience as a nuclear safety regulator and an extensive review and analysis of documents related to Cotter's operation of the Latty Avenue facility and the AEC's licensing and inspection oversight. During the period that Cotter held a license, Latty Avenue and other similar facilities in the United States where licensed materials were used were subject to regulation by the AEC[5]. As described in greater detail later in my report, the AEC's regulatory program included safety requirements for licenses and requirements for license applications, licensee operations, and license terminations. It also included inspections by AEC inspectors. The application of this regulatory program generated a formal record of correspondence between the AEC and its licensees, such as Cotter.

To determine whether Cotter met federal regulations for releases of radioactive materials from Latty Avenue, I sought available documents related to the AEC's regulation of Latty Avenue. Staff under my direction at Talisman conducted research that identified relevant documents available from the NRC's ADAMS database and the more archival document collection in the NRC's Legacy database. I had access to documents related to Latty Avenue that were provided to me by counsel. I also obtained documents related to AEC's requirements.

The documents included Cotter's application to the AEC for a license and later for its termination, and the AEC's responses; AEC's findings from its inspections of Latty Avenue and Cotter's responses; other correspondence between Cotter and the AEC; the results of NRC

---

[4] *Virginia Uranium v. Commonwealth of Virginia*, Case No. CL15-623 in the Circuit Court of Wise County, Commonwealth of Virginia, expert for the Plaintiffs, deposed on July 7, 2017.
[5] The NRC began operations on January 19, 1975, U.S. NRC History, https://www.nrc.gov/about-nrc/history.html, accessed November 16, 2019.

COTTERKNAPP00000004

investigations prior to 1978 regarding the decommissioning of the Latty Avenue site; and internal Cotter, AEC, and NRC memoranda.

I reviewed these documents to evaluate whether they provided evidence that would indicate whether Cotter violated federal off-site emissions standards at Latty Avenue at any time during the period of my review and, importantly, to identify conclusions that were reached by the AEC about Cotter's compliance with the emissions standards during that time. The AEC documents were particularly salient because it was the regulator who determined whether the licensee is in compliance with regulatory requirements. A list of documents I considered is provided in Attachment B to this report. The opinions and conclusions I have formed from my review are set forth below.


**Regulatory Standards**

Congress gave the AEC responsibility for radiological protection.  The regulations promulgated by the AEC were consistent with the best national and international thinking at the time.

10 C.F.R. 20.105 and 20.106 set forth the amount of radiation that may be released to the accessible environment and the permissible concentration of radionuclides in the effluents released to the accessible environment. The regulatory standards are not the concentration of radionuclides in the accessible environment, nor are they background levels of radiation, and they are not "As Low as Reasonably Achievable" (ALARA); that is, they do not require that exposures to ionizing radiation be kept as far below the dose limits as practical. The AEC did not use ALARA as a regulatory limit, but rather as encouragement to licensees to control and reduce exposures where they reasonably could.  By contrast, the release limits set forth in 10 CFR Part 20 Appendix B for each isotope are formal regulatory limits.

At the time Cotter was the licensee at Latty Avenue, Part 20 was consistent with recommendations issued by the National Committee on Radiation Protection[6] (NCRP), which were based on considerable scientific study and represented the best scientific thinking at the time.

NCRP's recommendations, which were published in National Bureau of Standards (NBS) Handbook 52,[7] included levels of maximum permissible exposure to serve as guides to safe operation of a facility.[8] Handbook 52 gives the Maximum Permissible Concentrations (MPCs) of certain radionuclides in the air and water that one may take regularly into the body, conservatively derived on the basis of continuous exposures for a lifetime.[9] As NCRP said in

---

[6] In 1964, the NCRP was reorganized and chartered as the National Council on Radiation Protection and Measurements.
[7] "Maximum Permissible Amounts of Radioisotopes in the Human Body and Maximum Permissible Concentrations in Air and Water," NBS Handbook 52, March 20, 1953.
[8] Ibid., page 1.
[9] Ibid.

COTTERKNAPP00000005

NBS Handbook 59, permissible dose was a dose for which the probability of injuries was so low that competent medical authorities would not find it deleterious to health.[10] AEC established comparable limits for radionuclide concentrations in airborne effluents to unrestricted areas in Part 20. The AEC limits for public exposure to uranium—such as handled by Cotter at Latty Avenue under its AEC license—included a safety factor of ten, as recommended by NCRP. AEC discussed the safety of its standards in its Statement of Considerations that accompanied the publication of Part 20 in 1957. It said:

> It is believed that the standards incorporated in these regulations provide, in accordance with present knowledge, a very substantial margin of safety for exposed individuals.[11]

In 1959, NCRP revised its recommendations and published them in NBS Handbook 69. NCRP recommended that radiation or radioactive material outside a controlled area should be controlled so that it would be improbable for an individual to receive a dose of more than 0.5 rem annually (500 millirem ("mrem"))[12], and provided a table of corresponding MPCs.

The AEC responded to NCRP's changes by amending Part 20 effective January 1, 1961[13] to provide MPCs for additional isotopes and to revise some of the MPCs already in place. The AEC said:[14]

> These levels are believed to be sufficiently low to provide reasonable assurance that individuals in unrestricted areas will not receive a dose to the whole body in any period of one year in excess of 0.5 rem [500 mrem].

The sections of Part 20 that address the limit of 0.5 rem and the MPCs were 20.105 and 20.106, respectively. From 1968[15] through 1981,[16] these sections read, in part:

> § 20.105 Permissible levels of radiation in unrestricted areas.
>
> (a) There may be included in any application for a license or for amendment of a license proposed limits upon levels of radiation in unrestricted areas . . . The commission will approve the proposed limits if the applicant demonstrates that the proposed limits are not likely to cause any individual to receive a dose to the whole body in any period of one calendar year in excess of 0.5 rem.

---

[10] "Permissible Dose from External Sources of Ionizing Radiation," NBS Handbook 59, September 24, 1954, page 27.

[11] 10 CFR Part 20, Standards for Protection Against Radiation, 22 FR 548, January 29, 1957, at 549.

[12] "Maximum Permissible Body Burdens and Maximum Permissible Concentrations of Radionuclides in Air and in Water for Occupational Exposure," NBS Handbook 69, June 5, 1959, page 6.

[13] 10 CFR Part 20, Standards for Protection Against Radiation [Revised], AEC, January 1, 1961.

[14] 10 CFR Part 20, Standards for Protection Against Radiation, Miscellaneous Amendments, 25 FR 8595, September 7, 1960, at 8596.

[15] 10 CFR Part 20, §§20.105(b) and 20.106(a), 1968.

[16] 10 CFR Part 20, §§20.105(b) and 20.106(a), 1981.

COTTERKNAPP00000006

(b) . . . no licensee shall possess, use or transfer licensed material in such a manner as to create in any unrestricted area from radioactive material and other sources of radiation in his possession:

(1) Radiation levels which, if an individual were continuously present in the area, could result in his receiving a dose in excess of two millirems in any one hour, or

(2) Radiation levels which, if an individual were continuously present in the area, could result in his receiving a dose in excess of 100 millirems in any seven consecutive days.

and

§ 20.106 Radioactivity in effluents to unrestricted areas.

(a) A licensee shall not possess, use, or transfer licensed material so as to release to an unrestricted area radioactive material in concentrations which exceed the limits specified in Appendix "B", Table II of this part, . . . For purposes of this section concentrations may be averaged over a period not greater than one year.

. . .

(d) For the purposes of this section the concentration limits in Appendix "B", Table II of this part shall apply at the boundary of the restricted area. The concentration of radioactive material discharged through a stack, pipe or similar conduit may be determined with respect to the point where the material leaves the conduit. If the conduit discharges within the restricted area, the concentration at the boundary may be determined by applying appropriate factors for dilution, dispersion, or decay between the point of discharge and the boundary.

The definition of 'unrestricted area' in Part 20 from 1968[17] through 1981[18] was:

any area access to which is not controlled by the licensee for purposes of protection of individuals from exposure to radiation and radioactive materials, and any area used for residential quarters.

From the above, two points about the determination of a licensee's effluent concentration are clear. First, the determination may be made at the boundary of the restricted area. Second, if the discharge occurs within the restricted area, the licensee may determine the concentration at the boundary by taking into account appropriate factors for dilution, dispersion, or decay between the point of discharge and the boundary.

---

[17] 10 CFR Part 20 §20.3 (a)(17), 1968.
[18] 10 CFR Part 20 §20.3 (a)(17), 1981.

COTTERKNAPP00000007

The MPCs given in Appendix B, Table II for uranium and thorium isotopes of interest remained unchanged from 1961 through 1991[19]. NCRP and AEC values for the isotopes of interest to this report are shown in Table 1.

Table 1 – Maximum Permissible Concentrations (MPC) of Thorium and Uranium in Air and Water

From NBS Handbook 69 and 10 CFR Part 20 (1961-1974)

| Radionuclide | Maximum Permissible Concentrations | | | |
|---|---|---|---|---|
| | Microcuries per Milliliter of Air | | Microcuries per Milliliter of Water | |
| | Maximum Permissible Concentrations for continuous exposure, NBS Handbook 69[20] | AEC concentration limits in unrestricted areas, 10 CFR Part 20 (1961), Appendix B, Table II, Column 1, Air | Maximum Permissible Concentrations for continuous exposure, NBS Handbook 69[21] | AEC concentration limits in unrestricted areas, 10 CFR Part 20 (1961), Appendix B, Table II, Column 2, Water |
| Uranium-234, Soluble | $2.0 \times 10^{-10}$ | $2.0 \times 10^{-11}$ | $3.0 \times 10^{-4}$ | $3.0 \times 10^{-5}$ |
| Uranium-234, Insoluble | $4.0 \times 10^{-11}$ | $4.0 \times 10^{-12}$ | $3.0 \times 10^{-4}$ | $3.0 \times 10^{-5}$ |
| Uranium-235, Soluble | $2.0 \times 10^{-10}$ | $2.0 \times 10^{-11}$ | $3.0 \times 10^{-4}$ | $3.0 \times 10^{-5}$ |
| Uranium-235, Insoluble | $4.0 \times 10^{-11}$ | $4.0 \times 10^{-12}$ | $3.0 \times 10^{-4}$ | $3.0 \times 10^{-5}$ |
| Uranium-238, Soluble | $3.0 \times 10^{-11}$ | $3.0 \times 10^{-12}$ | $4.0 \times 10^{-4}$ | $4.0 \times 10^{-5}$ |
| Uranium-238, Insoluble | $5.0 \times 10^{-11}$ | $5.0 \times 10^{-12}$ | $4.0 \times 10^{-4}$ | $4.0 \times 10^{-5}$ |
| Thorium-230, Soluble | $8.0 \times 10^{-13}$ | $8.0 \times 10^{-14}$ | $2.0 \times 10^{-5}$ | $2.0 \times 10^{-6}$ |
| Thorium-230, Insoluble | $3.0 \times 10^{-12}$ | $3.0 \times 10^{-13}$ | $3.0 \times 10^{-4}$ | $3.0 \times 10^{-5}$ |

---

[19] In 1991, the NRC made significant changes to Part 20. See 10 CFR Part 20, Standards for Protection Against Radiation, Final Rule, 56 FR 23360, May 21, 1991.
[20] "Maximum Permissible Body Burdens and Maximum Permissible Concentrations of Radionuclides in Air and in Water for Occupational Exposure," NBS Handbook 69, op. cit., pages 81-83 and 85-86.
[21] Ibid.

COTTERKNAPP00000008

Note that Table 1 shows that the AEC concentration limits in unrestricted areas were a factor of ten lower than the NCRP continuous exposure limits, as recommended by NCRP. Based upon the consistency between NCRP and AEC concentration limits in 1961, it is evident that AEC's regulations concerning airborne and liquid emission limits were consistent with the national and international standards of the day.

It is also evident that Part 20 included the principle that some radionuclide emissions could be released into unrestricted areas outside the plant boundary with a substantial margin of safety to exposed individuals.

In summary, AEC's MPCs in Part 20 for radioactivity in airborne releases were clearly consistent with the standards of the day and provided a very substantial margin of safety for exposed individuals.  These MPC values applied to Latty Avenue through the time that Cotter was an active licensee.


Decommissioning Guidance

Cotter applied for termination of its license on May 10, 1974[22]. At that time, AEC had issued guidelines for decontamination of equipment and facilities[23]. These guidelines set criteria for three types of radioactive material that might be on surfaces, premises, or equipment.  Very simply stated, the first type is very much like uranium, thorium and their daughters; the second type is principally other isotopes that are alpha emitters; and the third is other isotopes that are beta-gamma emitters.[24] The guidelines provide different limits for each type of material. These limits are shown in Table I or II of the guidelines. A simplified version of Tables I and II reads:

---

[22] Letter from Edward J. McGrath on behalf of Cotter to W. Burkhardt, May 10, 1974. COTTER00000892-96

[23] Guidelines for Decontamination of Facilities and Equipment Prior to Release for Unrestricted Use or Termination of Licenses for Byproduct, Source, or Special Nuclear Material, AEC, December 1973. COTTER00009851-55

[24] Alpha radiation consists of particles that travel only a few centimeters in air and are unable to penetrate the outer layer of dead skin cells. However, if an alpha emitting isotope is ingested in the body, it can cause cell damage in the immediate vicinity of where the alpha decay occurs. Beta radiation is able to travel up to a few meters in air and a few centimeters in the body, so it can provide an external health risk. Gamma radiation can travel long distances and provides an external health risk.

COTTERKNAPP00000009

Table 2 – Simplified Version of AEC Decommissioning Guidelines

| SURFACE CONTAMINATION LEVELS | | | | |
|---|---|---|---|---|
| ISOTOPES | TABLE I | | TABLE II | |
| | TOTAL | REMOVABLE | TOTAL[C] | REMOVABLE |
| 1.  U-natural, U-235, U-238, Th-natural, Th-232 and associated decay products | 10,000[A] | 1,000 [A] | 5,000 [A] Avg | 1,000 [A] |
| | | | 25,000 [A] Max | |
| 2.  Other isotopes which decay by alpha emission or by spontaneous fission | 1,000 [A] | 100 [A] | 500 [A] Avg | 100 [A] |
| | | | 2,500 [A] Max | |
| 3.  Beta-gamma emitters (isotopes with decay modes other than alpha emission or spontaneous fission) | 0.4[B] | 1,000 [A] | 0.2 [B] | 1,000 [A] |
| | | | 1.0 [B] | |

A – Disintegrations per minute (dpm) per 100 cm$^2$

B – mrad[25] per hour

C – The measurement is not to be averaged over an area larger than 10 square meters.

The guidelines allow licensees to use either Table I or Table II. A licensee would use Table I if the remaining radioactivity was below the limits of that table. Should a licensee have some spots where the radioactivity exceeds the limits in Table I, it could use the limits in Table II.

While the above guidance was not formalized in AEC regulation, it did provide the agency's guidance to support, among other things, license termination, so it was reasonable for licensees to use it.

**Cotter's Performance as a Licensee**

This section discusses Cotter's performance as an AEC licensee in four subsections: Cotter's response to AEC regulation, Cotter's application for and receipt of a license, Cotter's performance as a licensee, and Cotter's application for and receipt of license termination. Each of the last three sections begins with a description of how AEC regulated that activity.

---

[25] A rad is a unit for measuring absorbed energy from radiation. A millirad (or mrad) is 1/1000 of a rad.

COTTERKNAPP00000010

<u>Cotter's Response to Regulation</u>

During the period covered by my review, I found that Cotter took a proactive approach to AEC regulation.  Cotter was responsive to AEC's findings and recommendations and met or exceeded AEC requirements. Some examples are:

Cotter's consultant, Ryckman, Edgerly, Tomlinson, and Associates (RETA)[26], remarked in an August 18, 1970 memorandum, immediately after Cotter initiated operations at Latty Avenue:

> It should be noted that many of the safety precautions have been introduced.  Use of "captive clothing" including boots and uniforms has begun as well as on-site shower facilities.  Cotter Corporation's support of widespread use of respirators is especially commendable.[27]

Within a week, Cotter also issued film badges to all of its on-site workers.[28]

Cotter had a health and safety program in place at its Cañon City facility as early as 1961.[29] The first page of that document contains the following sentences:

> The Atomic Energy Commission has published "Title 10, Part 20" as a standard for protection against radiation. *The rules and regulations in this Part 20 are to be followed to the letter*. (emphasis added)

This program documented four main safety considerations: airborne radioactive dust both within and outside the plant's restricted areas; external radiation monitoring in work areas; monitoring of effluents leaving restricted areas; and medical supervision of employees. It discussed particular hazards such as dust associated with crushing and processing ore, and capping barrels of yellowcake[30]. It also described sampling equipment, locations, frequencies and procedures. This program was, of course, more extensive and detailed than the one at Latty Avenue. This was because Cotter's operations at Cañon City included more complex and hazardous operations such as leaching ore and producing yellowcake, whereas at Latty Avenue Cotter simply dried wet residues. Cotter was able to draw on its Cañon City experience to decide what the appropriate features of the Latty Avenue safety program should be, and the AEC found them to be acceptable in its review of Cotter's license application.

---

[26] As stated in Cotter's license application, its radiation safety program was to be under the direction of [Ed] Edgerley, who had a radiological health minor as part of a doctoral program at the University of California, who taught courses in engineering aspects of radiological health and who had 12 years' experience as an Environmental Engineer involving various phases of engineering related to radiological safety.

[27] RETA memorandum from PKF to HDT, EE, and DLB, August 18, 1970. COTTER00001480-82

[28] Bi-Monthly Monitoring Report for Cotter Corporation, September 30, 1970. COTTER00001473

[29] The Health Physics Program at Cotter Corporation, Cañon City, CO, November 7, 1961. COTTER00014886

[30] Yellowcake is a mixture of uranium oxides that are produced from uranium ore in the uranium recovery process.

11

COTTERKNAPP00000011

When the AEC did note a deficiency in Cotter's activities, Cotter quickly acted to address it.  For example, following a November 17, 1970 inspection, the AEC wrote Cotter,[31] saying that:

> Contrary to 10 CFR 20.201(b), "Surveys," air sample surveys were inadequate to determine concentrations of airborne uranium ore materials to which persons were exposed during drying and loading operations at the Hazelwood, Missouri facility.

Cotter responded on January 7, 1971,[32] saying:

> This letter is in reply to your correspondence of December 4, 1970 . . . we are at the present time initiating a monitoring program which *shall comply in all aspects to AEC regulations 10 CFR 20.201(b).* (emphasis added).
>
> . . .
>
> It is the full intention of this firm to obtain and analyze all the necessary samples and have them submitted to you in report form on or before January 15, 1971.

The AEC responded to Cotter on January 15, 1971,[33] thanking Cotter for its response and saying that AEC would review the matter at its next inspection. This response documents that Cotter's January 7 letter had met AEC expectations because otherwise, AEC would have taken additional actions. Note also that any violation of 10 CFR 20.201(b) relates to the lack of adequate air sample surveys *on the facility site,* and not whether members of the *general public* were being exposed to levels of radiation exceeding the limits of 10 CFR 20.105 or whether levels of radioactive materials exceeding the limits of 10 CFR 20.106 left the site boundaries.

In 1971 and 1972, Cotter repeatedly sought a way to dispose of the wastes remaining at Latty Avenue that would comply with AEC regulations. For example:

- In April 1971, Cotter applied to the AEC for permission to dispose of the wastes at a property owned and controlled by the AEC in Weldon Springs, Missouri,[34] which AEC had indicated was a disposal option in its 1960 invitation to bid to Cotter[35].

- On June 24, 1971, Cotter met with AEC to discuss the possibility of burying the wastes on-site at Latty Avenue[36], and learned that obtaining authorization for such disposal "would not be an easy matter" and "could only be allowed after provision has been made for assuring perpetual maintenance of the site."

---

[31] Letter from Boyce H. Grier to Donald [sic] P. Marcott, December 4, 1970. COTTER00005098
[32] Letter from David P. Marcott to Boyce H. Grier, January 7, 1971. COTTER00001453
[33] Letter from Boyce H. Grier to Donald [sic] P. Marcott, January 15, 1971. COTTER00005095
[34] Letter from Edward J. McGrath to Robert Hollingsworth, April 28, 1971.  COTTER00001796
[35] AEC "Request for Proposals for the Purchase and Removal of Uranium Contaminated Residues" to David P. Marcott, June 10, 1960.  COTTER00002568-69
[36] AEC memo from J. C. Malaro to files, July 9, 1971.  NRC Accession Number ML16021A452 pages 169-70.

COTTERKNAPP00000012

- On December 16, 1971, Cotter's representative met with Nuclear Fuel Services to discuss the possibilities of disposing of the material at the West Valley, New York facility[37].

- On December 6, 1972, Cotter submitted a decommissioning proposal[38] to the AEC to dispose of the wastes at the Weldon Springs Quarry Dump Site maintained by the AEC in St. Charles County, Missouri. The AEC responded on January 29, 1973[39]. Its response reads in part:

> Your proposal for depositing material from decontamination of the Latty Avenue, Hazelwood, Missouri, Site in the Quarry Dump site is not acceptable to the Atomic Energy Commission. This would be in direct competition with established commercial burial grounds . . .

The above documents demonstrate Cotter's intent and its substantive efforts to find a way to dispose of the remaining wastes in accordance with AEC regulatory requirements. As is discussed in more detail below, Cotter ultimately disposed of the wastes by mixing them with soil to below licensable concentrations and transporting them to a landfill. The NRC's Assistant General Counsel later determined that Cotter's method of disposal of the leached barium sulfate was not prohibited by the regulations. No fine or citation was ever issued for this disposal.

Finally, in a separate regulatory event, on October 19, 1970, Cotter received a letter from the St. Louis County Health Department Division of Air Pollution Control raising concerns about visible emissions from the drying facility at Latty Avenue and asking Cotter to submit plans within five days for controlling air pollution emissions from the plant[40]. On October 22, 1970, three days after Cotter's receipt of the letter, a RETA employee visited the site to observe operating procedures and make recommendations for improving emissions. He reported that steps had already been initiated to reduce atmospheric particulate emission[41]. He concluded his report by saying:

> My over-all opinion of the operation is that the pollution abatement equipment is working very satisfactorily and that Mr. Brokaw and his men are cooperating in every possible way to reduce the excessive emission[42].

---

[37] Letter from R. T. Smokowski to Edward. J. McGrath, December 21, 1971. COTTER00000832 Cotter also explored disposal options with Nuclear Engineering Company in May 1971. COTTER00001397
[38] Letter from David P. Marcott to Frank Pittman, December 6, 1972. COTTER00000842
[39] Letter from R. J. Hart to David P. Marcott, January 24, 1973. COTTER00001786-87
[40] The actual letter from the Health Department has not been located. The letter was described in RETA's Bimonthly Monitoring Report II, November 30, 1970. COTTER00001459
[41] RETA memorandum from PKF to EE and HDT, October 22, 1970. COTTER00004801-02
[42] Ibid. COTTER00004802.

COTTERKNAPP00000013

In summary, the above documents show that it was clearly Cotter's policy to comply with AEC regulations, and that when Cotter was faced with regulatory concerns it did its best to meet or exceed the regulator's expectations.


License Application

AEC reviewed license applications to determine whether the agency could have reasonable assurance of the radiological safety of the proposed operation. Therefore, an application needed to contain enough information for AEC to independently confirm this radiological safety. AEC's review usually would result in the agency sending requests for additional information (RAIs) to the applicant. In response to RAIs, the applicant would provide additional information and often revise the application. Often more than one round of RAIs would occur. For example, when the Contemporary Metals Corporation applied for a license for the Latty Avenue site in 1962, the AEC's review resulted in two rounds of RAIs.[43,44] When all of the RAIs were addressed to AEC's satisfaction, the license would be issued. A license generally would be issued with license conditions, which would include commitments made in the license application.

When Cotter submitted its license application[45] to the AEC on December 16, 1969[46], the materials at the Latty Avenue site already were under license to the Commercial Discount Corporation of Chicago (CDC)[47,48] and had been licensed to Continental Mining & Milling (CMM) before that. Cotter applied for a license to possess 500,000 pounds of $U_3O_8$, and stated in its application that it would not "process" this material at Latty Avenue. Instead, Cotter said it would condition the material by drying it to 15% moisture and would ship it to Cañon City, Colorado. Cotter's application stipulated that its workers would be issued film badges, that the area would be monitored on a bi-weekly basis using a radiation detector, that air samples would be taken on a bi-weekly basis, that continuous air sampling would be performed in the areas of greatest mechanical and physical activity, and that six dust collectors[49] would be placed around the storage and loading facility to monitor dust in the environment. Because Cotter did not conduct chemical processing, the application was simpler than most source material license applications. The AEC reviewed Cotter's application without additional documented correspondence and granted Cotter License number "SUB-1022" two weeks later on December

---

[43] Letter from Donald A. Nussbaumer, AEC, to Clemons M. Roark, Contemporary Metals Corporation, May 25, 1962. COTTER00009512-13
[44] Letter from Donald A. Nussbaumer, AEC, to Clemons M. Roark, Contemporary Metals Corporation, June 22, 1962. COTTER00009523-24
[45] Cotter License Application. COTTER00000888-91
[46] Letter from David P. Marcott to AEC, December 16, 1969. COTTER00000805
[47] License No. SMC-907, December 29, 1966. COTTER00004755-56
[48] Amendment to SMC-907, June 23, 1967. COTTER00004779-4780
[49] "Six dust collectors consisting of a 360º sticky paper sampler and a dust fall bucket will be placed in the area surrounding the storage and loading facility to continuously monitor the dust in the environment. These will be changed on a bi-weekly basis."  Cotter License Application, op cit.

COTTERKNAPP00000014

30, 1969 without issuing any RAIs.[50]  Of course, AEC was familiar with the Latty Avenue site and the materials stored there, having issued licenses to two prior licensees, and AEC was also familiar with Cotter, as Cotter was an existing licensee[51,52].

Performance While a Licensee

AEC's regulation of operating licensees consisted principally of inspection, communications, and direction associated with the inspections. In unusual circumstances, these communications and direction might involve issuing orders or imposing civil penalties (fines). Apart from inspections, AEC's activities included notifying licensees about safety issues and responding to licensee correspondence, which usually involved license amendments or decommissioning.

AEC's inspection program addressed radiological safety and compliance with regulations. Health and safety inspections addressed all areas of radiological safety, including AEC's regulations and any license conditions. Routine inspections occurred periodically, with the frequency generally depending on the complexity and potential safety issues associated with the license. For a licensee like Cotter, inspections would generally have occurred about once every two years. Inspections also were conducted to observe or confirm decommissioning activities. Inspections might also occur after safety-related events, to investigate allegations, and to check on a licensee's responses to an earlier inspection.

Inspections might be announced or unannounced. Before the inspection, inspectors would review the AEC's file on the license, which would include the license and any license conditions, recent correspondence between AEC and the licensee, and the results of previous inspections. Inspectors were expected to note violations found during prior inspections and confirm that licensees had taken appropriate corrective action.

The inspections themselves generally included three activities, which are consistent with NRC's inspection practices today. They included observation of facilities and work practices, interviews with managers and workers, and reviews of records. Inspections were conducted to learn whether radioactive materials were properly controlled, whether areas containing radiation or radioactive materials were properly restricted, and whether radiological monitoring equipment was operational. Inspectors would observe work practices to learn whether employees were taking

---

[50] Letter from Don F. Harmon to David P. Marcott, December 30, 1969. COTTER00000815-16

[51] On November 18, 1969, Cotter wrote AEC asking if another license would be needed for Hazelwood, since it already held license R-197 for its Cañon City facility. (NRC Accession Number 9609050157)

[52] Because thorium is present in natural uranium, it was not uncommon for the AEC to omit specific references to thorium (and other decay products of uranium) in its source material licenses for uranium. For example, the following source material licensees did not explicitly include thorium in their applications: Pathfinder Lucky Mc, Umetco, and Western Nuclear. Likewise, although thorium was discussed in the correspondence between AEC and Union Carbide concerning the Uravan facility license renewal application, neither the Union Carbide license renewal application nor the AEC license that was issued explicitly mentioned thorium.

COTTERKNAPP00000015

proper precautions when handling radioactive materials, whether they were using personal monitoring equipment properly, and whether they followed appropriate procedures when leaving areas containing radioactive materials. Inspectors reviewed records to learn whether required monitoring was being conducted and recorded, and whether the records indicated any overexposures or effluent releases in excess of regulatory requirements. They also would have reviewed the licensee's records of any events that involved permitted releases, unintended releases, equipment malfunctions, or other similar events. They would have reviewed training records to learn whether employee training was being conducted in accordance with the licensee's commitments. They would have interviewed workers and managers to learn whether they understood and practiced the radiological safety training they had received and whether they had any radiation safety concerns the AEC should have been aware of.

Inspectors documented their inspection results in a report that was reviewed by management and sent to the licensee, who would be directed to address any concerns identified during the inspection. Depending on the issue, licensees might be required to respond in writing by a specific date that they had addressed the concern. AEC typically followed up to ensure that corrections were made, usually at the next inspection. If the concerns were significant, AEC might conduct a follow up inspection or shorten the interval before the next inspection.  Where appropriate, AEC would also issue civil penalties (fines) for violations.

AEC visited Latty Avenue once and formally inspected it twice while Cotter was the licensee. The visit occurred in April 1970.[53] The inspections occurred on November 17, 1970[54] and on April 10 and 24, 1974.[55]

*AEC Visit April 1970*

The AEC's April 1970 visit was consistent with its practice of visiting some of its licensees shortly after granting a license to confirm the licensee's statements in its application. AEC reported that at the time of the April 1970 visit, the facility was at a standstill with only security guards present.

*AEC Inspection November 17, 1970*

AEC conducted a routine inspection at Latty Avenue on November 17, 1970. AEC's report of the inspection[56] included a discussion of the history of Latty Avenue and a description of Cotter's operations. AEC reported that Cotter began drying material on August 13, 1970, and that the drying operation usually yielded about 350 to 450 dry tons of material during a normal

---

[53] Documented in AEC report of November 17, 1970 inspection. COTTER00001688
[54] AEC report of November 17, 1970 inspection. COTTER00001685-95
[55] AEC report of April 10 and 24, 1974 inspection. COTTER00001675-82
[56] AEC report of November 17, 1970 inspection, op. cit.

COTTERKNAPP00000016

workday. AEC also said that according to Cotter's records, materials had been shipped on approximately 50 days since August 13th, with an average quantity shipped of 400 tons per day.[57]

AEC reported that Cotter had arranged for the B&K Construction Company to handle the materials and control the site, and had contracted with the consulting firm of Ryckman, Edgerly, Tomlinson, and Associates (RETA) to handle health physics[58] activities.[59]

The report described the facilities and equipment and said that Cotter was using the same facilities and equipment that the AEC had noted during prior inspections of the facility. The report also described procedures and said that the newly dried material seemed to be somewhat like sand or cinders in size.[60]

The report said that there were nine employees, that all had been assigned film badges, and that between the end of August and the end of October, the largest dose any employee had received was 110 millirem, with the remaining doses ranging from "minimal to 80 millirem for that period." Eventually RETA reported that the highest dose received for any employee over the period of dryer operation (August 1970 – February 1971) was 230 mrem[61], less than the Part 20 public exposure limit of 500 mrem per year and significantly less than the Part 20 exposure limit for workers in restricted areas of 5 rem (5,000 mrem) per year[62]. AEC also reported that the health physics surveys performed by RETA included stream samples, radiation level surveys at the fence line, and air sampling of work areas.[63]

The report also documented RETA's analysis of water samples taken downstream from Latty Avenue. It said that the highest sample result showed approximately 4.5 X 10[-6] microcuries/milliliter, which was about one fifth of the AEC's limit for natural insoluble uranium in water[64]. The report also reported radiation levels outside the fenced-in area at Latty Avenue. It said that they were less than 0.6 millirem per hour (mR/hr)[65] at 18 inches from the fence, which

---

[57] Ibid. COTTER00001689

[58] Health physics . . . deals with the protection of the individual and population groups against the harmful effects of ionizing and nonionizing radiation. (From Introduction to Health Physics, Herman Cember, 1996).

[59] Ibid.

[60] Ibid. COTTER00001691

[61] RETA Proposal for Decontamination of Latty Avenue Storage Site, May 1972. COTTER00000858

[62] 10 CFR 20.101(a) limited individuals in restricted areas to 1¼ rem per quarter, which is 5 rem per year, 10 CFR Part 20, 1970.

[63] AEC report of November 17, 1970 inspection, op. cit. COTTER00001692

[64] The maximum permissible concentration (MPC) for natural insoluble uranium in water was 2 X 10[-5] microcuries/ml or greater, depending on the isotope (10 CFR Part 20, Appendix B, Table II, 1970).

[65] The unit mR/hr means milliRoentgen per hour. A Roentgen is a unit of exposure to radiation. For comparison purposes, the average American is exposed to about 300 mR per year from background radiation and about another 300 mR per year from medical procedures.

COTTERKNAPP00000017

means they were below the AEC radiation limit[66]. It also said that the radiation measurements were confirmed by the AEC inspector.

As noted above, the AEC inspection report cited Cotter for apparent noncompliance with 10 CFR 20.201(b), "Surveys," because the AEC found that air sample surveys were inadequate to determine concentrations of airborne radioactivity in the working areas (on-site) during drying and loading operations.

There are two items of note in the inspection report. First, the inspector documented three of RETA's airborne sampling results, which included a high of 19.70 milligrams per cubic yard[67] in the loading area, measured on September 28, 1970. This concentration is equivalent to about $1.37 \times 10^{-10}$ microcuries per ml, based on the 1183 counts per minute per gram reported in AEC's November 17 inspection report and assuming a 10% counting efficiency.[68] This value is very similar to one reported in a RETA letter to Cotter in 1973[69], which said:

> High volume air samples taken inside the dryer building under the most severe dust conditions showed an average level of $18 \times 10^{-11}$ uc/ml [equal to $1.8 \times 10^{-10}$ microCi/ml].

The above values are from the loading area and inside the dryer building. However, as I discuss above, the AEC emissions limits apply at the boundary of the restricted area, take into account dilution and dispersion between the point of discharge of the material and the boundary, and are averaged over a year. Cotter only operated the dryer for about 8 hours a day for a total of about 50 days. Taking into account dilution and dispersion, and averaging over a year, it is very unlikely that Cotter would have exceeded AEC's emission limits at any point on the boundary[70].

---

[66] The 0.6 mR/hr limit is derived from 20.105(b)(2), which says that radiation levels in unrestricted areas may not result in an individual receiving a dose in excess of 100 millirems in any seven consecutive days. Dividing 100 millirem by 168 hours in a week yields about 0.6 mR/hr.

[67] Ibid. COTTER00001694

[68] Ibid. COTTER00001693-94

[69] Letter from P. K. Feeney to David P. Marcott, February 15, 1973. COTTER00001727-29

[70] 20.106(a) permits averaging over a year, so the concentration of $1.8 \times 10^{-10}$ microCi/ml would be averaged by multiplying by 50 days X 8 hours/day and dividing by 365 days/year X 24 hours/day or
$$1.8 \times 10^{-10} \times 50X8/(365X24) = 8.2 \times 10^{-12}$$
This concentration would be carried across the site by the wind. Before it reached the boundary of the restricted area, this concentration would be reduced by dilution and dispersion, probably by at least a factor of two, so
$$8.2 \times 10^{-12}/2 = 4.1 \times 10^{-12} \text{ microCi/ml}$$
This concentration is then corrected for variation in wind direction, which over the course of a year will blow in many directions, so that any point on the boundary will be in the direct path for only a short time. The annual average concentration at any one point on the boundary should be reduced accordingly. The compass wind rose for St. Louis for the year 1970 (located at  https://wrcc.dri.edu/cgi-bin/wea_windrose.pl?laKSTLhttps://wrcc.dri.edu/cgi-bin/wea_windrose.pl?laKSTL, select January 1 – December 31, 1970) shows that the wind direction was not in any quarter as much as 30% of the time over that year, so the concentration is reduced by a factor of 3, or
$$4.1 \times 10^{-12}/3 = 1.4 \times 10^{-12} \text{ microCi/ml}$$

COTTERKNAPP00000018

The second item of note in the inspection report is that the AEC's citation raised concerns about concentrations to which persons were exposed during drying and loading operations. It did <u>not</u> raise concerns about releases of airborne materials offsite. This is notable because the inspector would have documented any concerns about the possibility that Cotter might have been in violation of AEC's emission limits. The AEC did, in fact, cite licensees who actually exceeded these limits. For example, see the report of its 1961 inspection of another licensee, the US Radium Corporation.[71],[72] The AEC never cited Cotter for any impermissible emissions off-site of Latty Avenue.

In summary, the AEC inspection of Latty Avenue did not find Cotter in violation of AEC limits on either airborne or liquid effluents, nor did it find Cotter in violation of AEC limits on radiation in unrestricted areas, and neither have I.

The AEC also wrote an internal memo about the November 17 inspection,[73] which said, in part,

> There appears to be only one significant health and safety problem at present during this moisture removal and loading operation. This problem relates to the inadequate air sampling as performed by the licensee's consultant . . . The condition of the source material being handled does not, however, appear to cause a significant hazard to personnel in the area.

The inspection resulted in a letter from the AEC to Cotter dated December 4, 1970, which attached the finding of noncompliance with 10 CFR 20.201(b) and gave Cotter 20 days to advise the AEC in writing about Cotter's position on the item and to include the date that all corrective action had been, or would be, taken.

As I discussed above, Cotter responded to AEC's letter on January 7, 1971[74], saying that it would implement "a monitoring program which shall comply in all aspects to AEC regulations 10 CFR 20.201(b)".  Cotter also committed to obtain and analyze all necessary samples and submit them in a report to AEC by January 15, 1971.  AEC acknowledged receipt of Cotter's letter on January 15, 1971[75] and said that it would review the matter during its next inspection, which documents that Cotter's response was acceptable.

---

This value is less than half of the most restrictive uranium concentration limit from Table 1 in this report, which is $3.0 \times 10^{-12}$ microCi/ml, that is

$$1.4 \times 10^{-12} \text{ microCi/ml} < 3.0 \times 10^{-12} \text{ microCi/ml}$$

[71] AEC inspection report of November 13-17, 1967 inspection of U.S. Radium Corporation, February 5, 1968.  NRC Accession Number ML041380342

[72] This inspection report about the U.S. Radium facility said, in part: "Contrary to 20.106(a) 'Concentrations in Effluents to Unrestricted Areas', the release of airborne soluble tritium to unrestricted areas via stack discharges from the Gas Fill Facility, have exceeded the concentrations set forth in 10 CFR 20, Appendix B, Table II, when averaged over one year."

[73] AEC memorandum from E. C. Ashley to James M. Allan, November 17, 1970. NRC Accession number is ML16021A452 (at p. 171).

[74] Letter from David P. Marcott to Boyce H. Grier, January 7, 1971, op. cit.

[75] Letter from Boyce H. Grier to Donald [sic] P. Marcott, January 15, 1971, op. cit.

COTTERKNAPP00000019

*RETA Letter February 15, 1973*

In 1973, RETA sent a letter to Cotter[76] that included a discussion of water samples that had been taken from Coldwater Creek. It read, in part:

> Water samples were taken from Coldwater Creek both upstream and downstream of the site and their radioactivity measured. Initial tests were ran [sic] in June, 1968 and several latter samples were collected and analyzed. These results remained generally unchanged at 2 X 10$^{-6}$ uc/ml and, consequently, sampling was discontinued in October, 1970.

These findings are significant in at least three respects.  First, since RETA found that the results remained generally unchanged from upstream of the Latty Avenue site to downstream of the site, RETA found no evidence of releases of radioactive material from Latty Avenue. Second, since RETA found that the results remained generally unchanged from June 1968 through October 1970, RETA found no evidence that Cotter's radioactive materials affected Coldwater Creek between the time that Cotter became a licensee (December 30, 1969) and the time that Cotter dried and shipped the bulk of its residues to Cañon City. Third, if it is assumed that the measured radioactivity was due to uranium (from some upstream source), the observed levels of 2 X 10$^{-6}$ microcuries/ml are less than a tenth of the 10 CFR Part 20 MPCs for uranium in water shown in Table 1 of this report. Of course, AEC's concentration limits apply to effluent releases, not to environmental samples. Nonetheless, the most straightforward interpretation of these measurements is that either Cotter released no measurable radioactivity from Latty Avenue to Coldwater Creek while it was a licensee, or that any releases that might have occurred were well below AEC limits.

*AEC Inspection April 1974*

AEC conducted another inspection at Latty Avenue on April 10 and April 21-24, 1974[77].  The inspector recounted what had occurred more than three years earlier; that Cotter dried residue and shipped it to its facility at Cañon City, Colorado, from August through about November 1970, when problems with the dryer caused a halt in activities. At that time, about 10,000 tons of Colorado raffinate and 8,700 tons of leached barium sulfate remained on the site. The inspector was told by Cotter representatives that the site then remained unoccupied until mid-1973 when the Colorado raffinate was shipped to Cañon City and the leached barium sulfate, mixed with about 38,000 to 39,000 tons of soil from Latty Avenue, was shipped to a St. Louis County sanitary landfill. Based on this information, the inspector stated in his report that Cotter was in

---

[76] Letter from Phillip K. Feeney to David P. Marcott, February 15, 1973, op. cit.
[77] AEC report of April 10 and 24, 1974 inspection, op. cit.

COTTERKNAPP00000020

violation of 10 CFR 20.301, "Waste Disposal, General Requirement," in that disposal of licensed material made from July 31, 1973 through October 12, 1973 was in a manner not authorized.[78]

The inspector also reported that licensee representatives said they surveyed the remaining land surface at Latty Avenue to determine whether it read less than 0.6 mR/hr at the surface. RETA said that if it was higher, soil was removed until that value was reached. RETA said that only a 10 foot by 10 foot area was found above 0.6 mR/hr and that the rest of the area averaged less than 0.1 mR/hr.[79]

Finally, the inspector documented a management meeting with Mr. Marcott in which they discussed Cotter's determination that the uranium content of the leached barium sulfate residues was reduced to a non-licensable percentage by the addition of quantities of soil[80].

As a result of the April 1974 inspection, the AEC had internal discussions[81] [82]about whether to issue a notice of violation to Cotter for mixing the leached barium sulfate with soil prior to it being transported to the West Lake Landfill, without prior AEC approval. However, when the AEC wrote to Cotter on November 1, 1974[83], the agency did <u>not</u> cite Cotter for a violation. Rather, the letter said, in part:

> The disposal does not appear to be within the intent of the Commission's regulation, 10 CFR Part 40, to allow alteration of the physical nature of the Source material (i.e. dilution of solids with non-radioactive source material) in order to obtain a physical mixture which would no longer be subjected to licensing by the Commission.

In my review of the AEC's development of this position, I found that it appears to have been documented for the first time in a letter to another licensee on January 9, 1973[84]. However, I found no evidence that Cotter had been made aware of this position or that Cotter knew that its actions might have been inconsistent with the intent of 10 CFR Part 40.

In its formal communication to Cotter on the issue, the AEC did not find Cotter to be in violation of Section 20.301. The AEC said that Cotter's disposal appeared to be outside the *intent* of 10 CFR Part 40, but there is no evidence that Cotter was made aware of the AEC's interpretation of the "intent" of the regulatory language prior to its disposal action.

---

[78] Ibid. COTTER00001679-80
[79] Ibid. COTTER00001681
[80] Ibid. COTTER00001677
[81] AEC Internal memo from James Allan to H. D. Thornburg, May 17, 1974. NRC Accession Number ML13008A248 (pdf pages 6-7 of 13)
[82] AEC Internal memo from Gen W. Roy to H. D. Thornburg, June 26, 1974. NRC Accession Number ML13008A248 (pdf pages 1-2 of 13)
[83] Letter from John G. Davis to David P. Marcott, November 1, 1974. COTTER00001673-74
[84] Letter from J. C. Malaro, AEC, to Molybdenum Corporation of America, January 9, 1973. NRC Accession Number 8605150581

COTTERKNAPP00000021

Moreover, although the AEC considered whether to find Cotter in violation for transferring the leached barium sulfate to a sanitary landfill, in the November 1 letter, it chose not to do so. In fact, the AEC did not find Cotter in violation of the regulations, nor did it issue any citation, fine, or penalty.

Based on these documents and my own experience at the NRC, I conclude that the AEC deliberately chose not to cite Cotter for a violation for mixing the leached barium sulfate with topsoil and transferring the mixture to a landfill.

This issue was directly addressed later in a letter about this incident from the NRC's Assistant General Counsel, which stated:

> Whether there was a violation of 10 CFR 20.301, as stated in the inspection report, depends upon how 10 CFR 40.13(a) is construed. We note that there is nothing in that section or elsewhere in 10 CFR Part 40 that expressly prohibits dilution of source material in a mixture to below .05 weight percent in order for it to be exempted from the regulations in Part 40. If exempt, the requirement for transfer to an authorized recipient would not apply.[85]

Thus, as determined by the NRC's Assistant General Counsel, there was nothing in the regulations that prohibited Cotter's method of disposal of the leached barium sulfate. After reviewing both of the above inspections, I found no evidence that AEC cited Cotter for violating either the limits on permissible levels of radiation in unrestricted areas contained in 10 CFR 20.105 or the limits on radioactivity in effluents to unrestricted areas contained in 10 CFR 20.106. Further, I found no evidence that AEC had ever considered doing so.

It is useful to compare Cotter's performance as a licensee with that of the Nuclear Materials and Equipment Corporation (NUMEC),[86] which operated a nuclear fuel development and manufacturing facility in Apollo, Pennsylvania from about 1957 through 1978. Both facilities were licensed to handle uranium, but there were significant differences between them:

- The uranium at Latty Avenue was present in low concentrations, less than 1% by weight, whereas the uranium processed by NUMEC was present in higher concentrations in compounds such as $UF_6$ and $U_3O_8$. Further, the uranium at Latty Avenue was not enriched while the uranium at NUMEC was. That is, the NUMEC material was capable of going critical[87]. Thus, the hazards associated with the material at Latty Avenue were dramatically less than the hazards associated with the material at NUMEC.

---

[85] Letter from Stuart A. Treby, Assistant General Counsel for Rulemaking & Fuel Cycle, Office of the General Counsel to Richard E. Cunningham, Director, Division of Industrial and Medical Nuclear Safety, Office of Nuclear Material Safety & Safeguards, February 17, 1988.

[86] Recently, NUMEC, like Cotter, has been involved in litigation concerning compliance with emissions standards at the time it was in operation.

[87] That is, sustaining a nuclear chain reaction.

COTTERKNAPP00000022

- The only activity occurring at Latty Avenue consisted of drying uranium compounds. By contrast, NUMEC engaged in a number of complex activities, in particular, chemically processing $UF_6$ (uranium hexafluoride) into metal, metal alloys, oxides and sulfides.

- Off-gases from the Latty Avenue dryer were processed through a dust collector and wet scrubber[88] and released through a single stack. By contrast, NUMEC off-gases were processed through high-efficiency filters that fed over 100 stacks.

Two AEC inspections of the NUMEC facility[89,90] raised concerns about surveys and concentrations of radioactive material released at the stacks. Specifically, both inspection reports said that:

> surveys were inadequate to determine compliance with 10 CFR 20.106(b) with respect to the airborne concentrations of radioactive materials released to unrestricted areas, contrary to 10 CFR 20.201(b), "Surveys."

In these letters the AEC also said:

> Based on your records of airborne concentrations of radioactive materials discharged from your effluent stacks in 1963, it appears that the concentrations released to unrestricted areas may have exceeded the limits set forth in 10 CFR 20.106(b).[91]

and

> Based on your records of airborne concentrations of radioactive materials discharged from your effluent stacks in 1965, it appears that the concentrations released to unrestricted areas may have exceeded the limits set forth in 20.106(a).[92]

These comments show that if the AEC considered a licensee's (in this case NUMEC's) surveys inadequate, and also had concerns about airborne concentrations exceeding Part 20 limits, it raised them with the licensee. The AEC did not raise concerns about releases to unrestricted areas at Latty Avenue while Cotter was a licensee.

Although the AEC raised these concerns at the NUMEC facility, the airborne concentration data documented in both reports showed releases at the roof edge were below Part 20 limits. Such findings were consistent with AEC regulations because Section 20.106(a) provided that

---

[88] AEC Inspection Report November 17, 1970, op. cit. COTTER00001691
[89] AEC letter from Eber Price, AEC to Zalman Shapiro, Nuclear Materials and Equipment Corporation, March 27, 1964.
[90] AEC letter from Eber Price, AEC to Zalman Shapiro, Nuclear Materials and Equipment Corporation, October 7, 1965.
[91] AEC letter from Eber Price, AEC to Zalman Shapiro, Nuclear Materials and Equipment Corporation, March 27, 1964, op. cit.
[92] AEC letter from Eber Price, AEC to Zalman Shapiro, Nuclear Materials and Equipment Corporation, October 7, 1965, op. cit.

COTTERKNAPP00000023

measurements could be averaged over a year, and Section 20.106(d) provided that for discharges within the restricted area, the concentrations at the boundary might be determined by applying appropriate factors for dilution, dispersion, or decay between the point of discharge and the boundary.

In fact, NUMEC records show multiple discrete instances of exceeding Part 20 concentration limits at its stacks, but after taking into account sections 20.106(a) and (d) as mentioned above, the AEC did not find the NUMEC facility's airborne releases averaged over a period of one year to unrestricted areas to be in violation of 10 CFR Part 20.

In view of the above AEC experience, it is noteworthy that the agency did not require Cotter to monitor releases at its dryer stack, nor did the AEC raise any concerns about radionuclide releases at the boundary of the accessible environment. It is reasonable to infer that the AEC simply considered that the very low concentrations of uranium in the Latty Avenue residues made it very unlikely that the stack releases would be a potential source of danger to public health and safety. And in fact, I have found no documented airborne releases from the Latty Avenue plant that would suggest otherwise.


License Termination

In 1974, AEC regulations[93] stated that "The Commission may terminate a specific license upon request submitted by the licensee to the Commission in writing."

Cotter applied for license termination on May 10, 1974[94]. With its application, Cotter provided a completed version of AEC's "Certification of Status of Source Material Activities" and a survey of the Latty Avenue site[95]. The Latty Avenue survey, completed on April 29, 1974, showed that all locations fell below the "allowable 0.6 MR/hr[96] (approximately 2,000 counts per minute) level." The measurements were identified as "Values of Gross Activity in mR/hr. at approximately three feet above grade."

The AEC memo dated June 26, 1974[97], which was discussed above, also addressed Cotter's termination request:

> [Licensing] has received a request for license termination from Cotter Corporation together with the results of Cotter's beta-gamma radiation surveys of the Hazelwood, Missouri site subsequent to decontamination efforts. In this regard, RO:III has requested decontamination criteria for "ground" surveys since the "Decontamination Guide," which has previously been furnished [to] Cotter

---

[93] 10 CFR 40.71(d).
[94] Letter from Edward J. McGrath on behalf of Cotter to W. Burkhardt, May 10, 1974, op. cit.
[95] Letter from Phillip K. Feeney to David P. Marcott, May 1, 1974.  COTTER00006239
[96] mR/hr is milliroentgens per hour, where roentgen is a measure of radiation dose.
[97] AEC Internal memo from Gen W. Roy to H. D. Thornburg, June 26, 1974, op. cit.

COTTERKNAPP00000024

Corporation[98] does not specifically discuss ground surveys (only equipment, buildings, etc.). However, a precedent has already been established for using the "guide" for surveys of ground areas around uranium mills, which Licensing and RO have found to be acceptable in the past. Such a survey has consisted of a surface alpha survey using the limits in row No. 1 of either table 1 or 2 of the guide and a beta-gamma survey using row No. 3 of the guide. We have been informed by L that they plan to write back to Cotter requesting an alpha survey in addition to the beta-gamma survey already submitted. Of course, in extending the guide to ground surveys in this manner only direct radiation measurements have been taken, no smears for removable contamination.

I have found no documentation that AEC requested Cotter to perform an alpha survey. However, the record shows that Cotter did ask RETA to perform such a survey.[99] RETA performed that survey on November 8, 1974[100], and reported to Cotter on November 11, 1974 that all areas showed very low activity with the exception of an area about 20 feet in diameter that exceeded 1,500 counts per minute (cpm) with a maximum level of 2,000 cpm. In order to compare these results to the AEC's decommissioning guidelines[101] discussed above, it is necessary to convert RETA's reported cpm values to disintegrations per minute (dpm)/100 square cm[102]. At RETA's reported 12% counting efficiency, 1,500 cpm becomes about 12,500 dpm and 2,000 cpm becomes about 17,000 dpm. Taking into account the area of RETA's survey instrument[103], these become a little less than 11,000 dpm/100 square cm and 15,000 dpm/100 square cm. Table 3 shows a comparison of the values in row No. 1 of the guidelines with RETA's measurements. Because RETA's values are greater than the limits in Table I of the

---

[98] This is likely the December 1973 guidance, which was the most recent guidance available. *See* Guidelines for Decontamination of Facilities and Equipment Prior to Release for Unrestricted Use or Termination of Licenses for Byproduct, Source, or Special Nuclear Material, AEC, December 1973. COTTER00009851-55

[99] Letter from Phillip K. Feeney to David P. Marcott, November 11, 1974. COTTER00001699-1700
[100] Ibid.
[101] Guidelines for Decontamination of Facilities and Equipment Prior to Release for Unrestricted Use or Termination of Licenses for Byproduct, Source, or Special Nuclear Material, AEC, op. cit.

[102] The difference between counts per minute (cpm) and disintegrations per minute (dpm) is that disintegrations per minute describes what is actually going on in the radioactive material itself, while counts per minute describes what the probe, or survey instrument which is just above the surface, is measuring. This is analogous to the difference between the sounds of a singer's voice and what a microphone actually picks up. Depending on how far the microphone is from the singer, and how efficient the microphone is, it will pick up less than the exact sound of the singer's voice. Similarly, counts per minute are always lower than disintegrations per minute because some of the radiation released by the radioactive material is absorbed by the air and does not reach the probe, and because the probe is not 100% efficient.

[103] The November 11 letter from Feeney to Marcott stated that the meter probe had a surface area of approximately 18 square inches. The flat side of the probe would have been held very near the surface being measured and measured the radiation being given off as counts per minute.

COTTERKNAPP00000025

guidelines (See Table 2, line number 1 of this report), it is appropriate to compare them to the Table II limits.

Table 3 – Comparison of AEC Decommissioning Guidelines to

November 8, 1974 RETA Survey

| SURFACE CONTAMINATION LEVELS | | | | |
|---|---|---|---|---|
| | TABLE I | | TABLE II | |
| | TOTAL | REMOVABLE | TOTAL[B] | REMOVABLE |
| 1. <u>AEC alpha limits</u> for U-natural, U-235, U-238, Th-natural, Th-232 and associated decay products | 10,000[A] | 1,000 [A] | 5,000 [A] Avg<br>25,000 [A] Max | 1,000 [A] |
| 2. <u>RETA measurements</u> for U-natural, U-235, U-238, Th-natural, Th-232 and associated decay products | | | 11,000 [A] Avg<br>15,000 [A] Max | |

A – dpm per 100 cm$^2$
B – The measurement is not to be averaged over an area larger than 10 square meters.

Note B to Table 3 says that the measurement is not to be averaged over an area larger than 10 square meters. RETA reported the elevated readings over an area 20 feet in diameter, which is about 30 square meters.   Although the average radioactivity level in the 20-foot-in-diameter spot was about twice the limit for average radioactivity in the guidelines, the maximum alpha concentration observed by RETA was about 60% of the maximum limit in the guidelines, and nothing in the RETA survey indicated offsite releases of radiation or radioactive materials in excess of the limits in 10 CFR 20.105 or 10 CFR 20.106.

On November 13, 1974, the AEC terminated Cotter's license[104].


<u>Surveys/NRC Findings After License Termination Through 1977</u>

In 1976, the NRC conducted a special investigation of Cotter's disposal of the leached barium sulfate.[105] The report of that investigation reads, in part,

> Based on the direct radiation surveys, neither [the West Lake Landfill nor the Latty Avenue] site presents an immediate radiological health hazard to the public.

The report also concluded:

> No items of noncompliance were identified during this investigation.

---

[104] Letter from L. C. Rouse to David P. Marcott, November 13, 1974. COTTER00000899
[105] NRC Region III Special Investigation Report, January 4, 1977. COTTER00006204

COTTERKNAPP00000026

Further, Attachment A to the report[106] reads, in part,

> On May 10, 1974, Cotter reported exposure rates which ranged from 0.01 to 0.4 mR/hr measured at three feet above grade (type of instrument unknown). (Reference 1) These values were the basis for termination of the license by the Directorate of Licensing. (Reference 2) The Region III August 11, 1976 survey, made at the same distance, yielded readings ranging from 0.3 to 0.8 mrad/hr beta/gamma.
>
> . . .
>
> The presently acceptable limit for release of ground areas, as implied in the "Decontamination Guide" (Reference 4) is 0.4 mrad/hr, total, or 0.2 mrad/hr, average, with a maximum of 1.0 mrad/hr, all of which are to be measured at 1 cm with a probe of not more than 7 mg/$cm^2$ of total adsorber. Thus, the NRC Region III survey of August 11, 1976 showed radiation levels at the Latty Avenue site exceeding the acceptable release limits, while the survey performed by Cotter Corporation showed levels within the guidelines. *Both surveys indicate a low, nonhazardous radiation level. The difference in results might be attributable to differences in instruments and procedures used.* (emphasis added.)

In 1977, the Energy and Research Development Administration (ERDA) conducted a survey of the Latty Avenue site on behalf of the NRC. The NRC wrote Cotter on August 16, 1977[107], and said that the survey indicated a strong probability of the presence of licensable quantities of source material.

NRC met with Cotter on September 7, 1977. In his report of that meeting[108], G. P. Rifakes of Cotter wrote, in part:

> Further analyses indicates that there are radiation levels at Latty Avenue which could indicate the presence of source materials.

One week later the NRC wrote to the current owner of the site, Mr. E. D. Jarboe.[109] This letter said, in part:

> The preliminary [ERDA] report indicates that at present the site poses no immediate health and safety problem; however, source material and the attendant radium is present in various concentrations over the site. The primary concern is the long term (continued occupancy for years) inhalation of radon gas and associated daughter products which emanate from the soil. The radon gas is normally diluted by the atmosphere in an open area but can build up and become concentrated in a building.

---

[106] Ibid. COTTER00006214
[107] Letter from Sheldon Meyers to David P. Marcott, August 16, 1977. COTTER00002578
[108] Internal Cotter memo by G. P. Rifakes of a meeting with NRC on September 7, 1977. COTTER00009210-13
[109] Letter from John B. Martin to E. D. Jarboe, September 16, 1977. COTTER00002502-2504

COTTERKNAPP00000027

I conclude from the above three documents that the results of the 1977 ERDA survey indicated that additional cleanup of Latty Avenue would be necessary. However, the residual radioactivity remaining at Latty Avenue did not present an immediate health and safety problem, and the NRC's primary concern was that radon and its daughter products that could become concentrated in a building on site. The NRC raised no safety concerns about offsite releases of radioactive materials.

In summary, both NRC's 1976 and 1977 surveys showed low levels of radiation that were characterized as non-hazardous and as presenting no immediate threat to health and safety, respectively.  Neither survey identified any concerns about offsite exposures.

In 1977, DOE began using Latty Avenue for the interim storage of radioactive soils and materials.[110] Since it was no longer clear who might be responsible for radioactivity at the site, I did not study the site after that year.

### Comments on Opinions of James Wells

I have reviewed the Expert Report of Dr. James Wells that was signed on March 31, 2019[111], Dr. Wells' Supplemental Expert Report, dated August 1, 2019[112], and portions of the transcript of Dr. Wells' deposition that took place on October 17, 2019[113]. A number of his statements are demonstrably incorrect, some of which I discuss below.

**Regulatory Standard**

In his Expert Report, Dr. Wells admits that effluent limitations for water may not have been exceeded[114]. However, he provides a footnote to this statement that reads: "Again, this is not to say either Mallinckrodt or Cotter is not strictly liable, did not breach its duty of care, and did not release radiation in excess of federal dose limits. . ." Dr. Wells has disregarded the applicable federal standard and has not identified an alternative objective standard.  As discussed throughout my report, compliance with the 10 CFR Part 20 limits is the standard that has been established under Federal law and regulation, and accepted by Federal courts, as providing adequate protection of public health and safety.

---

[110] Record of Decision for the North St. Louis County Sites, U.S. Army Corps of Engineers, September 2, 2005, pages 2-4.
[111] Expert Report of James T. Wells, PhD, PG, L. Everett & Associates, LLC., In the matter of: McClurg, et al. v. Mallinckrodt, Inc., et al., March 31, 2019
[112] Supplemental Expert Report of James T. Wells, PhD, PG. L. Everett & Associates, LLC. In the matter of: McClurg, et al. v. Mallinckrodt, Inc., et al., August 1, 2019
[113] Videotaped Deposition of James T. Wells, Ph.D., Los Angeles California, Thursday, October 17, 2019
[114] James Wells' Expert Report 'In the matter of: McClurg, et al. v. Mallinckrodt, Inc., et al.', March 31, 2019, page 12.

COTTERKNAPP00000028

In his Supplemental Report, Dr. Wells says: "It is my opinion that releases of contaminated soil and sediment into Coldwater Creek and its tributary ditches meet the definition of the release of "excessive radiation" as defined in 10 CFR §20."[115] Contrary to Dr. Wells' statement, I have been unable to find the phrase "excessive radiation" either defined or used in 10 CFR Part 20. Further, releases of contaminated soil and sediment are releases of radioactive materials, not releases of radiation. In addition, in his deposition, he makes several references to an AEC policy that licensees "should" limit exposures to radioactivity to "as low as reasonably achievable" (ALARA)[116]. He is incorrect in his understanding of the AEC's use of the ALARA policy, which was not used by the AEC as a regulatory limit, but rather as encouragement to licensees to control and reduce exposures where they reasonably can. By contrast, the release limits set forth in 10 CFR Part 20 Appendix B for each isotope are formal regulatory limits. Compliance with these limits is regulated and inspected by the NRC and constitutes the standard for the protection of public health and safety and the environment.

Finally, in his Expert Report, Dr. Wells states[117] that:

> The effluent limitations in 10 CFR §20 have been revised by the NRC a number of times over the years; it is my understanding that the Order envisions comparing site discharges to the original effluent guidelines promulgated in 1960.

The "Order" to which Dr. Wells refers appears to be Case Management Order 14 which refers to 10 CFR 20.106(a), but it does not specify a particular year (although it does specifically refer to the period from 1970-1974 for Latty Avenue). Because 10 CFR Part 20 is amended from time to time, the appropriate standards here are the versions of Part 20 for 1969-1974, when Cotter was the licensee.

**Latty Avenue**

Dr. Wells' assertions about Cotter's responsibilities at Latty Avenue appear to disregard the factual record. In his Expert Report, he holds Cotter responsible for Latty Avenue before Cotter became a licensee. He states: "Cotter was responsible for waste at Latty Avenue from mid-1966 through 1973, for a total of 7.5 years[118]. His stated logic is that although Cotter was not the licensee, it was responsible because it contracted to have material dried at Latty Avenue shipped to Colorado, and because in an October 1, 1968 letter to the AEC, a mining engineer employed at Cotter referred to "our" drying plant in Hazelwood, Missouri.

---

[115] James Wells' Supplemental Expert Report 'In the matter of: McClurg, et al. v. Mallinckrodt, Inc., et al.', August 1, 2019, page 10 of unnumbered document, page 191 of Wells Deposition Exhibits.
[116] James Wells' Deposition, October 17, 2019 pages 51, 113, 141, 267.
[117] James Wells' Expert Report, op. cit. page 12.
[118] James Wells' Expert Report. op. cit. pages 21-22.

COTTERKNAPP00000029

In addition, several times Dr. Wells has cited regulatory issues that apply to Cotter's predecessors. For example, he states: "The facility also received notices of non-compliance from the Atomic Energy Commission in 1966 and 1967 for contamination in unrestricted areas."[119] And: "In its 1968 inspection report, AEC noted that . . ."[120].

Contrary to Dr. Wells' beliefs, Cotter was not responsible for Latty Avenue's performance under AEC regulations until it became the licensee in December 1969. Before that time, as the record clearly shows, the Latty Avenue site was licensed by other organizations and the AEC held those organizations, not Cotter, responsible for performance at that site.

**Cotter's Attitude Toward Safety**

On page 11 of his Expert Report, Dr. Wells states: "In fact, both Mallinckrodt and Cotter engaged in a pattern and practice of failing to act with appropriate care, directly leading to releases of contamination in excess of federal limits."[121]

Concerning Cotter[122], there is simply no basis for Dr. Wells' assertion. As documented above in my report, Cotter repeatedly demonstrated a strong commitment to care and safety. For example, Cotter contracted with RETA to provide health physics advice and then followed that advice. Cotter responded promptly and properly to the November 17, 1970 AEC inspection and to the letter from the St. Louis Health Department.

**Cotter's Compliance with AEC Regulations**

Dr. Wells has asserted that Cotter did not comply with AEC regulations for airborne release of radioactive effluents. In Part b of Table 3 of his Expert Report[123], he finds that Cotter exceeded the AEC limits for thorium-230 for the third and fourth quarters of 1970 and for the first quarter of 1971, as a result of releases from the operation of the dryer at Latty Avenue.

I have divided my comments on Dr. Wells' assertion into two sections: the meaning of AEC's regulations, and the way in which Dr. Wells estimated offsite releases and compared them to the limits in Part 20.

<u>AEC Regulations</u>

As I said earlier in this report, a portion of § 20.106 reads:

---

[119] James Wells' Supplemental Expert Report, Wells Deposition Exhibits, Exhibit 13, page 7 of unpaginated document.
[120] James Wells' Supplemental Expert Report, Wells Deposition Exhibits, Exhibit 13, page 9 of unpaginated document.
[121] James Wells' Expert Report. op. cit. page 11.
[122] The scope of my work does not include Mallinckrodt.
[123] Wells' Expert Report, page 27th page (not numbered),

COTTERKNAPP00000030

§ 20.106 Concentrations in effluents to unrestricted areas.

(a) A licensee shall not possess, use, or transfer licensed material so as to release to an unrestricted area radioactive material in concentrations which exceed the limits specified in Appendix "B", Table II of this part, . . . For purposes of this section concentrations may be averaged over a period not greater than one year.

This text is important for two reasons. First, it is necessary to select the applicable limits in Table II of 10 CFR Part 20 Appendix B.  For the radionuclides of interest here, Table II provides limits for soluble and insoluble forms of the radionuclide that are generally different. To determine whether the limits are exceeded, it is necessary to determine whether the radionuclide in question is soluble or insoluble and then apply the corresponding limit. Second, the regulation permits licensees to average the concentration over a period of not greater than one year.

<u>Estimates of Offsite Releases and Comparison to Part 20</u>

This section documents the erroneous manner in which Dr. Wells estimated offsite releases and compared them to the effluent concentration limits in Part 20.

<u>Choice of Concentration Limits</u>

Most important is Dr. Wells' decision to use the Part 20 Table II limit for soluble thorium-230 rather than insoluble thorium-230. As shown below, the concentration limit for soluble thorium-230 is less than the limit for insoluble thorium-230 by the ratio of $3 \times 10^{-13}/8 \times 10^{-14}$ or a factor of about 3.7.

Table 4 – Concentration Limits for Thorium-230 in Air[124]

| Line | | Concentration in microcuries/ml |
|---|---|---|
| 1 | thorium-230 - Insoluble | $3 \times 10^{-13}$ |
| 2 | thorium-230 - Soluble | $8 \times 10^{-14}$ |
| 3 | Ratio of limit for Insoluble thorium-230 to limit for Soluble thorium-230 (Line 1 divided by Line 2 | $3 \times 10^{-13}/8 \times 10^{-14} =3.75$ |

The obvious question, then, is whether the thorium-230 at Latty Avenue was soluble or insoluble. On page 12 of his Expert Report, Dr. Wells states:

COTTERKNAPP00000031

> In its 1979 radiological survey of the SLAPS site, DOE used the "soluble" effluent
> limitations as a comparative guide, which I believe are the appropriate standards to
> use for the purpose of this report.

Dr. Wells' assertion that this 1979 radiological survey of the SLAPS site has anything to do with Cotter's activities at Latty Avenue as an AEC licensee is simply incorrect.  As seen in the DOE report, DOE was reporting radionuclide concentrations in water samples from Coldwater Creek and drainage ditches. Obviously, if thorium dissolved in water is to be compared to Part 20 limits, the appropriate limit is for soluble thorium. However, as its title states, DOE was reporting on a radiological survey of the St. Louis Airport Site. Latty Avenue is not even mentioned in the report. Dr. Wells provided no rationale for why the limits cited by DOE for the water samples from Coldwater Creek and drainage ditches at SLAPS should apply to the thorium-230 emissions from the dryer at Latty Avenue.

By contrast, the RAC report states[125] "According to Duffey's analysis (1986), the $^{230}$Th and $^{232}$Th produced in the MCW [Mallinckrodt Chemical Works] process were insoluble." Further, the 1976 NRC investigation report, states that ". . .  $U_3O_8$ combined with barium sulfate is known to be insoluble in water."[126]

Clearly, Dr. Wells should have based his choice of soluble versus insoluble limits on the available analysis of the actual material at Latty Avenue, not on an inference from a radiological survey of a different release mechanism (i.e., in water) at another location (i.e., the St. Louis Airport).

<u>Estimated Airborne Effluent Concentrations</u>

Dr. Wells basis for estimated airborne effluent concentrations is flawed and unreliable.

First, consider what actually happened to the dryer effluent at Latty Avenue. The effluent from the dryer stack went up in the air and then moved with the prevailing wind across the site boundary. As this happened, the dryer effluent was diluted and dispersed by the wind. The direction and dispersion of this material varied almost minute by minute with the direction and speed of the wind, resulting in considerable variability in effluent concentration at the site boundary.

Dr. Wells estimated this effluent concentration with an extremely simple model based on the total volume of air passing over the site. He calculated the volume of air over the site by multiplying the area of the site by a modeling height which he chose to be 10 meters. He next assumed that the effluent leaving the site was uniformly distributed throughout this volume. He then multiplied this volume by the wind speed to estimate how many volumes of air passed over the site per quarter of a year. Finally, he divided this quarterly volume into the amount of effluent released per quarter to arrive at concentrations.

COTTERKNAPP00000032

Clearly, his model is radically different from what actually took place. However, even if the concept of his model is accepted, it contains a number of errors that, when corrected, show that the Latty Avenue effluent concentrations were, in fact, well within the Part 20 limits.

First, Dr. Wells' model failed to reflect the height of the dryer stack. According to the RAC report[127], the dryer stack was 30 feet high. Effluents released from the stack would have traveled upwards a significant distance from the top of the stack, so Dr. Wells' modeling height of 10 meters (about 30 feet) is too low. The modeling height, in my opinion, should be at least twice the stack height. This would at least double the volume of air crossing the site in Dr. Wells' model.   If the volume of air is doubled, the effluent concentrations would be divided in half, so the estimated effluent concentrations in Table 3b in Dr. Wells' Expert Report should be divided by at least a factor of two.  I show this calculation in Line 3 of my Table 5 below.

Second, Dr. Wells did not apply the statement in Section 20.106 "For purposes of this section concentrations may be averaged over a period not greater than one year." If Dr. Wells had averaged the concentrations released from Latty Avenue over a year, he would have averaged them over a total of four quarters[128]. This would mean averaging the releases for the three quarters that the Latty Avenue site was in operation (the last two quarters of 1970 and the first quarter of 1971) plus a fourth quarter. The fourth quarter could be taken either immediately before or after the three operational quarters. In either case, because no releases were reported before or after the three operational quarters, the releases for this fourth quarter would be zero. I show this calculation in Line 4 of my Table 5 below.

Third, when averaging effluent concentrations at the site boundary, it is necessary to consider both the concentration of the effluent and the direction of the wind transporting it across the boundary. From a wind rose at the St. Louis Airport,[129] it is evident that the wind did not blow in any particular direction for as much as half the time, so the estimated amount of effluent crossing any given point on the boundary should be reduced by at least half.

By way of example, I have documented how the above corrections would impact Dr. Wells' results in the table below. Dr. Wells' results are taken from Table 3, Part b of his Expert Report. The quarters shown are for the three quarters that Cotter was operating the dryer.

---

[127] "Reconstruction of Plaintiff Doses Associated with Residues Stored at the St. Louis Airport Storage Site and the Hazelwood Interim Storage Site and Critique of Opinions by Dr. Cheremisinoff, Ms. Sears and Dr. Clark" op. cit., page 4-50
[128] Averaging here means adding the concentration released from the site in four quarters of a year and then dividing by four to get the average concentration released over a year.
[129] Located at  https://wrcc.dri.edu/cgi-bin/wea_windrose.pl?laKSTLhttps://wrcc.dri.edu/cgi-bin/wea_windrose.pl?laKSTL, select January 1 – December 31, 1970)

COTTERKNAPP00000033

Table 5 – Corrections to Thorium-230 Emission Concentrations in Wells' Table and Comparison to Correct Part 20 limits

| Line | Item | Q3 1970 (pCi/m$^3$) | Q4 1970 (pCi/m$^3$) | Q1 1971 (pCi/m$^3$) |
|------|------|------|------|------|
| 1 | Dr. Wells' estimated thorium-230 concentrations from Table 3 b of his report | 0.46 | 0.75 | 0.41 |
| 2 | Line 1 values multiplied by 120 over 90 to account for 90-day quarters[130] | 0.61 | 1 | 0.55 |
| 3 | Line 2 concentrations divided by 2 to reflect doubling the modeling height. (picocuries/cubic meter) | 0.31 | 0.5 | 0.28 |
| 4 | Average concentration over a year based on Line 3 values. Values for Q3 and Q4 of 1970 and Q1 of 1971 were then added and then divided by four quarters. (picocuries/cubic meter) | $\dfrac{(0.31 + 0.5 + 0.28 + 0)}{4} = 0.27$ | | |
| 5 | Line 4 concentration divided by 2 to conservatively correct for wind direction over a year (picocuries/cubic meter). This is the concentration that should have resulted from Dr. Wells model. | $\dfrac{0.27}{2} = 0.14$ | | |
| 6 | Part 20 limit for insoluble thorium-230, 3 X 10$^{-12}$ microcuries/ml expressed as picocuries/cubic meter | 0.3 | | |
| 7 | Line 5 divided by Line 6 - Ratio of corrected concentrations to Part 20 limit for insoluble thorium-230, shown as a percentage | **47%** | | |

As line 7 shows, for the corrected thorium-230 limit and corrected estimated concentration, Dr. Wells' model shows that effluent concentration at the Latty Avenue site was significantly less than the Part 20 airborne effluent limits for thorium while Cotter was a licensee.

**Assertions Set Forth in Plaintiff Complaints**

The following are assertions in the Complaints that I found to be particularly wrong or misleading:

---

[130] In calculating the volume of air flowing across the site, Dr. Wells used 120 days per quarter. The volume of air calculated per quarter should be based on 90 days.

COTTERKNAPP00000034

**Plaintiffs' Assertions:**

- Paragraphs 14 and 20 – Contrary to plaintiffs' statement in paragraph 14, 10 CFR Part 20 did not "[limit] levels of radiation and concentrations of radioactive material which could be created in unrestricted areas. . ." What Part 20 did was to establish limits for concentrations of radioactivity that could be released into unrestricted areas and for exposures to the general public.  It did not cover radioactivity that was "created" in unrestricted areas or released "in" unrestricted areas, it governed releases of radiation above regulatory limits "to" unrestricted areas.  Plaintiffs' statement in Paragraph 20 that "[d]uring the entire period between 1969 and 1973, no federal regulations governed the permissible or maximum amount of radiation to which a member of the general public could be exposed" is incorrect. Section 20.105 required licensees to limit doses to persons in unrestricted areas to 0.5 rem per year, 2 mrem per hour, and 100 mrem in any seven consecutive days. These limits applied to Cotter's activities throughout the time it was a licensee.

- Paragraphs 42, 45, 57, 62, 63, 84, 85 - Plaintiffs' assertions about on-site concentrations of radioactivity that showed "elevated levels of residual uranium and thorium," or on-site concentrations in excess of "regional isotope background values" or the presence of "contamination" on site do not demonstrate that Cotter violated the off-site emissions limits in 10 CFR Part 20.

- Paragraphs 17, 18, 20, 24, 67, 81 – Despite the assertions of plaintiffs and their experts, I have found no evidence that Cotter ever released radiation or radioactive materials off-site in excess of the Part 20 regulatory limits, or that any plaintiffs were exposed to radiation in excess of allowable regulatory limits.

**Summary**

Cotter was in compliance with AEC regulations as they applied to offsite releases of radiation and radioactive material while Cotter was the licensee at Latty Avenue, in particular 10 CFR 20.105 or 10 CFR 20.106.

Contrary to the allegations in the Complaints, during the entire period Cotter was licensed to possess radioactive materials at Latty Avenue, there were federal regulations promulgated by the AEC that governed the permissible or maximum amount of radiation to which a member of the general public could be exposed.

The AEC did not find Cotter in violation of any regulation for its disposal of the leached barium sulfate to a sanitary landfill -- nor did it issue any citation, fine, or penalty.

The AEC did not find the Latty Avenue facility's releases to unrestricted areas to be in violation of 10 CFR 20.105 or 10 CFR 20.106 while Cotter was the licensee.  Further, I found no evidence that suggests offsite releases from Latty Avenue during this period were in violation of these requirements.

When Dr. James Wells' analyses of thorium-230 releases from Latty Avenue are corrected, his model shows that thorium-230 concentrations in effluents from the Latty Avenue site are

COTTERKNAPP00000035

significantly less than the Part 20 airborne effluent limits for thorium-230 while Cotter was a licensee.

Cotter was responsive to AEC's findings and recommendations and met or exceeded AEC requirements or expectations.

Subsequent to termination of the Latty Avenue license, NRC did not find any evidence of radioactive materials from Cotter's prior operations at Latty Avenue that would have posed a significant danger to the surrounding population.

I found no evidence that Cotter ever violated AEC requirements with respect to either the amount of radiation to which a member of the general public could be exposed or releases of airborne and liquid radioactive material to the accessible environment. Therefore, I have concluded that Cotter met the appropriate standards that applied to its operation of the Latty Avenue facility.

Malcolm R. Knapp, Ph.D.

9/17/2020
Date

COTTERKNAPP00000036



# APPENDIX A

---

# Malcolm R. Knapp, Ph.D.
## Senior Nuclear Safety Consultant

<u>**Summary**</u>

Mal Knapp is a Senior Nuclear Safety Consultant to Talisman.  His licensing work has included developing Nuclear Regulatory Commission (NRC) regulations that apply to licensing radioactive waste disposal facilities and managing materials licensing in NRC's Region I.  As a private consultant he developed an analysis of the specific activities, professional skills, and resources necessary to develop and submit a license application to the NRC for a radioactive waste reprocessing facility. Recently, he developed procedures and guidance for licensing and inspecting radioactive materials for the Federal Authority for Nuclear Regulation (FANR), the nuclear regulatory body of the United Arab Emirates.

He has been an independent consultant in nuclear safety and management, with particular emphasis on nuclear waste management and disposal since his retirement from the NRC in 1999. His consulting clients have included the NRC, the Los Alamos National Laboratory, the Idaho National Laboratory, the Oak Ridge National Laboratory, the United Technologies Corporation, the U.S. Department of Energy (DOE) and the International Atomic Energy Agency, including working for the latter two agencies as a full-time employee for several months each.  He retired from the NRC as Deputy Executive Director for Regulatory Effectiveness, in which he was responsible for all research, investigations, enforcement, and emergency response for the agency. During his 20-year career with the NRC, he was also Deputy Director of the Office of Nuclear Materials Safety and Safeguards, where he was a founding co-chair of the Federal Government's Interagency Steering Committee on Radiation Standards (ISCORS), and was Acting Director of the Office of Research.  He was also Director of the Waste Management Division, where his responsibilities included high- and low-level radioactive waste management, uranium recovery and decommissioning.

Before becoming Director of that division, he was a principal author of the NRC's generic high level waste disposal regulation, 10 CFR Part 60. From 1989 through 1992 he was the Director of the Division of Radiation Safety and Safeguards in the NRC's Region I. There his responsibilities included licensing and inspection associated with about 4,000 materials licensees, and health physics, security and emergency planning for 32 commercial reactors. Prior to joining the NRC in 1979, he worked for the General Electric Company, principally at Corporate Research and Development, where he investigated gas turbine corrosion, heavy water separation and continuous casting of copper rod. He received a B.E.S. and an M.S.E. from Johns Hopkins University and a Ph.D. from Carnegie-Mellon University. All his degrees are in Chemical Engineering.

<u>**Education**</u>

Ph.D. (Chemical Engineering), Carnegie-Mellon University
M.S.E. (Chemical Engineering), Johns Hopkins University
B.E.S. (Chemical Engineering), Johns Hopkins University

COTTERKNAPP00000037

**Malcolm R. Knapp, Ph.D.**

---

<u>**Qualifications**</u>

**Radiological Safety -** Directly managed the NRC's regulation of radiological safety at all power and research reactors and materials licensees in Region I. Founding co-chair of the Federal Government's Interagency Steering Committee On Radiation Standards (ISCORS). Directly managed staff's approach to potassium iodide issues. Trained in various health physics classes, including the five-week DOE class at Oak Ridge. Principal author of FANR radiation protection program and FANR regulatory guide on radiation safety.

**Waste Management -** Twelve years experience as individual contributor, supervisor and manager in waste management. Former Director of the NRC's Waste Management Division, former Director of the NRC's Low-Level Waste and Decommissioning Division. Activities have included managing and participating in:

- NRC's regulatory program for spent fuel and high-level waste, including regulation development and interactions with US DOE; was a principal author of NRC's original high-level waste disposal regulation, 10 CFR Part 60.
- NRC's activities responding to the Low-Level Radioactive Waste policy Amendments Act of 1985; managed NRC's activities concerning low-level waste storage and disposal.
- NRC's activities associated with materials facility and reactor site decontamination and decommissioning, including B&W facility in Apollo, PA, Safety Light, Centichem and West Valley.
- NRC's regulation and oversight of uranium mill tailings and solution mines including DOE Title I sites and commercial sites.

As Deputy Director of Office of Nuclear Material Safety and Safeguards, was responsible for the NRC's involvement in DOE's Tank Waste Remediation System (TWRS) at Hanford, Washington.

**Material Safety -** Directly managed licensing, inspection, enforcement, and incident response for about 4,000 material licensees in the NRC's Region I, including hospitals, clinics, physicians, pharmaceutical manufacturers, large scale irradiators, radiographers and gage users. Often accompanied staff inspections of reactors and materials facilities. Conducted numerous enforcement conferences. Personally managed responses to materials incidents.

**Emergency Preparedness and Incident Response -** Responsible for emergency preparedness and incident response in the NRC's Region I. As Deputy Executive Director, responsible for NRC's Incident Response Center. Participated in numerous exercises. Personally initiated unannounced, off-hours exercise. Directed the NRC Response Center during Tokaimura criticality.

**Security -** Managed the NRC's security regulation of power reactors and fuel cycle facilities in Region I. Regulated activities included physical protection, access control, threat assessment and fitness for duty. Directed initial implementation of fitness for duty regulations.

**Management -** Twenty years managing NRC organizations of five to 400 staff and technical

COTTERKNAPP00000038

**Malcolm R. Knapp, Ph.D.**

contract support of up to $40 million annually.  Extensive experience in technical management, policy development, planning, budgeting, and project, contract and personnel management.

**Research -** As Acting Director of the NRC's Office of Nuclear Regulatory Research during 1997-1998, managed agency's research programs including those applicable to spent fuel storage, waste management, decommissioning, geosciences, reactor vessel and component aging, and health physics.

**Planning -** Principal contributor to the 1995-1996 NRC-wide planning efforts, including Strategic Assessment and Re-Baselining, and the Planning, Budgeting and Performance Management (PBPM) process.  Documented ongoing activities, assessed external factors, recommended strategies, and developed prioritization methods.

## **Employment**

**Talisman International, LLC**
- Federal Authority for Nuclear Regulation, United Arab Emirates
- Mitsubishi Nuclear Energy Services
- CACI
- Department of Justice
- Envirocare
- Idaho National Engineering Laboratory

**Private Consultant, 2000-Present** Clients include:
- United Technologies Corporation (UTC)
- Advisory Committee on Nuclear Waste, US Nuclear Regulatory Commission
- International Atomic Energy Agency
- Office of Civilian Radioactive Waste Management, US Department of Energy
- Los Alamos National Laboratory
- Informatics Corporation

**Department of Energy, 2003**
- Senior Technical Advisor for Licensing, Office of Civilian Radioactive Waste Management (six months)

**International Atomic Energy Agency, 2002**
- Leader, Radioactive Waste Disposal Unit (four months)
- Secretary, Network of Centers of Excellence; Training in and Demonstration of Waste Disposal Technologies in Underground Research Laboratories

**Parallax, Inc, 2000-2003**
- Assistant to the President
- Facilitator, DOE-sponsored Water Quality Project, at K-25 site, Oak Ridge TN

3

COTTERKNAPP00000039

**Malcolm R. Knapp, Ph.D.**

---

**U.S. Nuclear Regulatory Commission, 1979-1999**
- Deputy Executive Director for Regulatory Effectiveness
- Acting Director of NRC Office of Nuclear Regulatory Research
- Deputy Director of NRC Office of Nuclear Material Safety and Safeguards
- Director of Waste Management Division, Office of Nuclear Material Safety and Safeguards
- Director of Division of Radiation Safety and Safeguards, NRC Region I

**General Electric Corporation, 1972-1979**
- Staff Scientist, Corporate Research and Development
- Senior Research Engineer, Wire and Cable Division

**Allied Chemical Corporation (now Honeywell), 1966-1967**
- Process Engineer, Baltimore Chrome Plant

**Honors and Awards**

- Senior Executive Service Bonus Award, 1987-90, 1992-99;
- Certificate of Appreciation from NRC Chairman Shirley A. Jackson, for Strategic Assessment, 1996;
- Presidential Rank Meritorious Executive Awards 1990 and 1996;
- NRC Meritorious Service Award, 1987;
- NRC $1,000 Special Achievement Award, 1984;
- General Electric Patent Award, 1975;
- Otto Stern Award, Carnegie-Mellon University Chapter, Sigma Xi, 1972;
- Past member, Sigma Xi and Phi Kappa Phi Honorary societies.

**Patent**

"Oxygen Control in Continuous Metal Casting Systems," #3,987,224

**Publications**

"International Graded Approach to Waste Management," with John T. Greeves and Thomas La Guardia, 10th International Conference on Environmental Remediation and Radioactive Waste Management, proceedings, Glasgow, Scotland, September 4-8, 2005.

"Training in Waste Disposal Technologies in Underground Research Laboratories," with Michael J. Bell and Arnold Bonne, Proceedings of the 10th International High Level Radioactive Waste Management Conference, 30 March – 3 April 2003.

4

COTTERKNAPP00000040

**Malcolm R. Knapp, Ph.D.**

"Objectives and Current Status Of the IAEA Network of Centers of Excellence: Training in and Demonstration of Waste Disposal Technologies in Underground Research Laboratories," with Michael J. Bell, Proceedings of WM '03, February 2003.

"Regulating the Long-Term Safety of Radioactive Waste Disposal in the United States," with Michael Lee, Invited Paper, Regulating the Long-Term Safety of Radioactive Waste Disposal, Joint CNRA/RWMC/CRPPH Workshop, Cordoba, Spain, January 20-23, 1996.

"The Environmental and Ethical Basis of Geological Disposal." Cited Contributor, Collective Opinion of the Nuclear Energy Agency Radioactive Waste Management Committee, Organization for Economic Cooperation and Development, 1995.

"NRC Perspective on Low-Level Radioactive Waste Disposal," with H.L. Thompson, Jr., Proceedings of WM '87, March 1987.

"Regulatory Issues in Performance Assessment for High-Level Waste," with J.C. Belote and P.M. Ornstein, Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting December 12-15, 1983 (Invited Paper).

"Rationale for the Performance Objectives in 10 CFR Part 60," editor, Disposal of High-Level Radioactive Waste in Geologic Repositories, Enclosure G, NUREG-0804.

"Regulating the Development of a Waste Repository," with D.J. Fehringer, Underground Space, January/April 1982, p.217 (Invited Paper).

"Current NRC Perspective on the Regulation of an HLW Geologic Repository," with M.J. Bell and J.B. Martin, Proceedings of the 1981 National Waste Terminal Storage Program Information Meeting, U.S. Department of Energy, National Waste Storage Program, November, 1981, DOE/NWRS-15 (Invited Paper).

"Uncertainties in the Regulation and Licensing of a High-Level Waste Repository," with M.J. Bell and J.B. Martin, Proceedings of the Symposium of High-Level Radioactive Waste, Oak Ridge National Laboratory, March 9-13, 1981, NUREG/CR-0022 (Invited Paper).

"A Controllable Gas Stream Powder Feeder," with R.H. Arendt, R.A. Giddings, and C.W. Krystyniak, Powder Technology, 14, 1976, p.185.

"Gas Turbine Deposit Analysis and Models for Deposit Formation and Modification," with R.H. Arendt and C.W. Krystyniak, Proceedings of Metal-Slag-Gas Reactions and Processes Symposium, Electrochemical Society, May 1975.

"Kinetics of Reactions Between Magnetite and Carbon Monoxide Between 723 and 823°K," with K. Li and W.O. Philbrook, MET Trans B, 6B, 1975, p.513.

5

COTTERKNAPP00000041

**Malcolm R. Knapp, Ph.D.**

"Carbon Deposition During Iron-Oxide Reduction," Carnegie Technical, Carnegie-Mellon University, Pittsburgh, Spring, 1973.

"Experimental Techniques for the Study of Carbon Deposition During the Reduction of Magnetite by Carbon Monoxide," with K. Li and W.O. Philbrook, <u>New Methods of Investigation of Processes of Reduction of and Non-Ferrous Metals Part II</u>, (in Russian), p.41, Science Publishers, Moscow, USSR (1973) (Invited Paper).

"A Simple Continuously Weighed Rotating Disk Reactor," with K. Li and W.O. Philbrook, Rev. Sci. Ins. 1972, p.345.

## Congressional Testimony

Testified before the Subcommittee on Oversight and Investigations, House Commerce Committee, United States House of Representatives, concerning "The Paducah Gaseous Diffusion Plant: An Assessment of Worker Safety and Environmental Contamination," September 22, 1999.

## Litigation Testimony

Deposed as an expert witness in *McMunn v. Babcock & Wilcox*, Civil Action No. 10-143, in the United States Court for the Western District of Pennsylvania, expert for the Defendants, deposed on May 9, 2013.

Deposed as an expert witness in *Virginia Uranium v. Commonwealth of Virginia*, Case No. CL15-623 in the Circuit Court of Wise County, Commonwealth of Virginia, expert for the Plaintiffs, deposed on July 7, 2017.

## Presentations

Over 75 public and proprietary technical, program and policy presentations. Groups addressed include: National Academy of Sciences; American Institute of Chemical Engineers; American Metallurgical Society; National Council of State Legislators; Advisory Committee on Nuclear Waste; Advisory Committee on Reactor Safeguards; NRC All-Agreement States Meeting; National Low-Level Waste Management Forum; CAL-RAD Forum; North Carolina Low-Level Radioactive Legislators and Staff; and Vermont Legislative Hearing.

COTTERKNAPP00000042

Attachment B

**MALCOLM KNAPP – DOCUMENTS CONSIDERED**

10 CFR Part 20, Standards for Protection Against Radiation [Revised], AEC, January 1, 1961

10 CFR Part 20, Standards for Protection Against Radiation, 1957

10 CFR Part 20, Standards for Protection Against Radiation, 1968

10 CFR Part 20, Standards for Protection Against Radiation, 1970

10 CFR Part 20, Standards for Protection Against Radiation, 1981

10 CFR Part 20, Standards for Protection Against Radiation, Final Rule, 56 FR 23360, May 21, 1991

10 CFR Part 20, Standards for Protection Against Radiation, Miscellaneous Amendments, 25 FR 8595, September 7, 1960

10 CFR Part 40, Domestic licensing of Source Material

AEC "Request for Proposals for the Purchase and Removal of Uranium Contaminated Residues" to David P. Marcott, June 10, 1960.  COTTER00002568-69

AEC Inspection Report November 17, 1970, COTTER00001688

AEC Inspection Report of April 10 and 24, 1974 inspection. COTTER00001675-82

AEC Inspection Report, November 13-17, 1967, Inspection of U.S. Radium Corporation, February 5, 1968.  NRC Accession Number ML041380342

AEC internal memo from E. C. Ashley to James M. Allan, November 17, 1970. NRC Accession number ML16021A452 (at p. 171)

AEC internal memo from Gen W. Roy to H. D. Thornburg, June 26, 1974. NRC Accession Number ML13008A248

AEC internal memo from J. C. Malaro to files, July 9, 1971.  NRC Accession Number ML16021A452 pages 169-70

AEC internal memo from James Allan to H. D. Thornburg, May 17, 1974. NRC Accession Number ML13008A248 (pdf pages 6-7 of 13)

AEC internal memo from W. T. Crow to L. C. Rouse, November 13, 1974, COTTER00000897

AEC License No. SMC-907, December 29, 1966. COTTER00004755-56

Amendment to SMC-907, June 23, 1967. COTTER00004779-4780

Bi-Monthly Monitoring Report for Cotter Corporation, September 30, 1970. COTTER00001473

Cotter License Application. COTTER00000888-91

Formerly Utilized MED/AEC Sites Remedial Action Program Radiological Survey of the St. Louis Airport Storage Site, St. Louis, Missouri, Final Report, September 1979

1

COTTERKNAPP00000043

Attachment B

Guidelines for Decontamination of Facilities and Equipment Prior to Release for Unrestricted Use or Termination of Licenses for Byproduct, Source, or Special Nuclear Material, AEC, December 1973. COTTER00009851-55

https://wrcc.dri.edu/cgi-bin/wea_windrose.pl?laKSTLhttps://wrcc.dri.edu/cgi-bin/wea_windrose.pl?laKSTL, select January 1 – December 31, 1970)

https://www.nrc.gov/about-nrc/history.html, accessed November 16, 2019.

Internal Cotter memo by G. P. Rifakes of a meeting with NRC on September 7, 1977. COTTER00009210-13

Introduction to Health Physics, Herman Cember, 1996

James T. Wells' Expert Report March 31, 2019

James T. Wells' Videotaped Deposition, October 17, 2019

James T. Wells' Supplemental Expert Report, August 1, 2019

Letter from Boyce H. Grier to Donald [sic] P. Marcott, December 4, 1970, COTTER00005098

Letter from Boyce H. Grier to Donald [sic] P. Marcott, January 15, 1971, COTTER00005095

Letter from Cotter to AEC, November 18, 1969, NRC Accession Number 9609050157 (In ML16021A452, P210)

Letter from David P. Marcott to AEC, December 16, 1969, COTTER00000805

Letter from David P. Marcott to Boyce H. Grier, January 7, 1971, COTTER00001453

Letter from David P. Marcott to Frank Pittman, December 6, 1972, COTTER00000842

Letter from Don F. Harmon, AEC, to David P. Marcott, December 30, 1969, COTTER00000815-16

Letter from Donald A. Nussbaumer, AEC, to Clemons M. Roark, Contemporary Metals Corporation, June 22, 1962, COTTER00009523-24

Letter from Donald A. Nussbaumer, AEC, to Clemons M. Roark, Contemporary Metals Corporation, May 25, 1962, COTTER00009512-13

Letter from Eber Price, AEC to Zalman Shapiro, Nuclear Materials and Equipment Corporation, March 27, 1964

Letter from Eber Price, AEC to Zalman Shapiro, Nuclear Materials and Equipment Corporation, October 7, 1965

Letter from Edward J. McGrath on behalf of Cotter to W. Burkhardt, May 10, 1974, COTTER00000892-96

Letter from Edward J. McGrath to Robert Hollingsworth, April 28, 1971,  COTTER00001796

Letter from J. C. Malaro, AEC, to Molybdenum Corporation of America, January 9, 1973, NRC Accession Number 8605150581

COTTERKNAPP00000044

Attachment B

Letter from John B. Martin to E. D. Jarboe, September 16, 1977, COTTER00002502-2504

Letter from John G. Davis to David P. Marcott, November 1, 1974, COTTER00001673-74

Letter from L. C. Rouse to David P. Marcott, November 13, 1974, COTTER00000899

Letter from Phillip K. Feeney to David P. Marcott, February 15, 1973, COTTER00001727-29

Letter from Phillip K. Feeney to David P. Marcott, May 1, 1974, COTTER00006239

Letter from Phillip K. Feeney to David P. Marcott, November 11, 1974, COTTER00001699-1700

Letter from R. J. Hart to David P. Marcott, January 24, 1973, COTTER00001786-87

Letter from R. T. Smokowski to Edward. J. McGrath, December 21, 1971, COTTER00000832 Cotter also explored disposal options with Nuclear Engineering Company in May 1971, COTTER00001397

Letter from Sheldon Meyers to David P. Marcott, August 16, 1977, COTTER00002578

Maximum Permissible Amounts of Radioisotopes in the Human Body and Maximum Permissible Concentrations in Air and Water, NBS Handbook 52

Maximum Permissible Body Burdens and Maximum Permissible Concentrations of Radionuclides in Air and in Water for Occupational Exposure, NBS Handbook 69

NRC Branch Technical Position, Disposal or Onsite Storage of Thorium or Uranium Wastes from Past Operations, October 23, 1981

NRC IE Investigation Report 76-01, Jan. 4, 1977, at COTTER00006202-53

NRC internal memo from Stuart A. Treby to Richard E. Cunningham, February 17, 1988

NRC on Source Material, https://www.nrc.gov/materials/srcmaterial.html, accessed January 12, 2020.

NRC Region III Special Investigation Report, January 4, 1977, COTTER00006204

NRC Staff Requirements Memo - SECY-99-259 - Exemption in 10 CFR Part 40 for Materials Less Than 0.05 Percent Source Material - Options and Other Issues Concerning the Control of Source Material, March 9, 2000

Permissible Dose from External Sources of Ionizing Radiation, NBS Handbook 59

Reconstruction of Plaintiff Doses Associated with Residues Stored at the St. Louis Airport Storage Site and the Hazelwood Interim Storage Site and Critique of Opinions by Dr. Cheremisinoff, Ms. Sears and Dr. Clark

Record of Decision for the North St. Louis County Sites, U.S. Army Corps of Engineers, September 2, 2005, pages 2-4

RETA memorandum from PKF to EE and HDT, October 22, 1970, COTTER00004801-02

RETA memorandum from PKF to HDT, EE, and DLB, August 18, 1970, COTTER00001480-82

COTTERKNAPP00000045

RETA Proposal for Decontamination of Latty Avenue Storage Site, May 1972, COTTER00000858

St. Louis Airport Wind Rose Plot 1996-2005

St. Louis Site Remediation Task Force Report September 1996

The Health Physics Program at Cotter Corporation, Cañon City, CO, November 7, 1961, COTTER00014886

COTTERKNAPP00000046