**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| PAMELA BUTLER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 4:18-cv-01701-AGF |
| ) | |
| MALLINCKRODT LLC, et al., ) | Lead Case |
| ) | |
| Defendants. ) | |

# PLAINTIFFS' OPPOSITION TO DEFENDANT COTTER'S MOTION FOR SUMMARY JUDGMENT

## I. Introduction

Plaintiffs can make a submissible case on causation against Cotter even after this Court's *Daubert* rulings. The jury will hear evidence that exposure to the type of radiation at issue in this case can cause Plaintiffs' cancers, even at low levels. The jury will hear evidence that all other causes of the Plaintiffs' cancers have been ruled out. Hence, if the jury concludes Plaintiffs were exposed to Defendants' radiation at or above the low levels that can cause cancer, it can return a verdict in Plaintiffs' favor. Evidence to support this conclusion does not need to come from expert testimony. Instead, the governmental reports showing the extensive contamination throughout the area, coupled with the evidence of the many ways each Plaintiff was exposed to that contamination for many years, is sufficient. Defendant's motion should be denied.

Plaintiffs can also make a submissible case on the standard of care. The AEC did not have authority to regulate this radioactive waste until 1978, so no federal standard of care applies and Cotter is strictly liable. But even if the annual average limitations in 20 C.F.R. §20.106 apply, Dr. Wells' quarterly calculations show Cotter released thorium-230 during those quarters at levels that were so high that they pushed the annual average over the limit, even if Cotter release no thorium during the rest of the year. Respectfully, the Court should reconsider its ruling excluding this evidence from Dr. Wells and summary judgment is not warranted.

## II. Expert exposure testimony is not necessary to make submissible case on causation when other evidence is sufficient to allow a rational person to make a reasonable inference of exposure.

Summary disposition is available "only when there is no genuine of material fact and the moving party is entitled to a judgment as a matter of law." *Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). When considering a motion for summary disposition, the adjudicator must "view[] the record in the light favorable to [the non-movant] and give[] [the non-movant] the

benefit of all reasonable factual inferences" without "weigh[ing] the evidence, mak[ing] credibility determinations, or attempt[ing] to determine the truth of the matter." *U.S. v. Bame,* 721 F.3d 1025, 1028 (8th Cir. 2013). If there is sufficient evidence "to allow a rational trier of fact to find for [the plaintiff] on the required elements of his claims," summary judgment cannot be granted. *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1115 (8th Cir. 2018).

Expert testimony is not needed to survive summary judgment if the jury can reach an "intelligent or correct decision" without such testimony, or if the specific issue the jury is being asked to decide "relate[s] to matters which require only common knowledge and experience to understand them." *Housley v. Orteck Int'l, Inc.*, No. 4:05-CV-00531-JEG, 2007 WL 4727642, at *6 (S.D. Iowa June 6, 2007). For example, in *DeLuna v. Mower Cnty.*, 936 F.3d 711 (8th Cir. 2019), the Eighth Circuit held that expert testimony was not needed in an MSRA case because whether or not plaintiff's too-small shoes caused a blister which opened and became infected by MSRA involved matters "within the common knowledge of a layman." *Id.*, at 718.

The Eighth Circuit specifically holds that when expert testimony exists on the effects of exposure, expert testimony on the exposure itself is not necessary to survive summary judgment. *Doe v. Baxter Healthcare Corp.*, 380 F.3d 399 (8th Cir. 2004). All that is needed is evidence showing "a reasonable inference of exposure." *Id.* at 406 ("in cases involving exposure to asbestos, a reasonable inference of exposure to a defendant's asbestos-containing product, coupled with expert testimony regarding asbestos fiber drift and the cumulative effects of exposure to asbestos, is enough to prove proximate cause.") (internal citations omitted).

### III. Dr. Wells' quarterly calculations show it is impossible for the release of thorium-230 from Latty Avenue to be under 10 C.F.R. §20.106's limits on an annual average.

Cotter tells this Court "it is undisputed that had Dr. Wells calculated Cotter's thorium-230 releases based on annual averages, they would not have exceeded the limit." Cotter's

2

Memorandum, p. 7. This is flat-out wrong, and not supported by the record. Cotter never argued this point in its briefs in support of its Motion to Exclude Wells. Instead, it attached a 56-page report from one of its experts. In a small section of this report, not cited to by Cotter in its briefs, Cotter's expert admits that "[i]t is possible to calculate annual average concentrations from Dr. Wells' quarterly numbers," which would be lower than the quarterly numbers. ECF No. 54-1, p. 24. The Court relies on this to exclude Dr. Wells' opinions: "Moreover, Plaintiffs do not dispute Cotter's expert's assertion that 'had Dr. Wells calculated annual average concentrations (either on a calendar or operational year basis), these concentrations would have been significantly less than the quarterly numbers he provides in Table 3 of his report.'" Mem. and Order, p. 30 ECF No. 104 (quoting ECF No. 54-1, p. 24). Plaintiffs did not dispute that yearly concentrations are significantly less than the quarterly numbers, but Cotter was spewing so much thorium-230 in the air that even concentrations significantly less than Dr. Wells' quarterly numbers would exceed the 0.08 pCi/m3 limitation found in 10 C.F.R. § 20.106. Based on Dr. Wells' numbers, these "significantly less" annual averages would still exceed annual limitations in 1968, 1970, and 1971.

For example, Dr. Wells calculates the concentrations of thorium off-site for the third and fourth quarter of 1970 at, respectively, 0.46 and 0.75 pCi/m3. *See,* Plaintiffs' Additional Statement of Facts ("PSOF"), Nos 8-17. These concentrations are so high that even if Cotter did not release a single atom of thorium-230 the entire first half of 1970, it still far exceeded the 0.08 pCi/m3 annual average limitation, at 0.30 pCi/g ((0.46 + 0.75 + 0 + 0)/4 = 0.30 pCi/m3). *Id.* The same is true for 1968. Dr. Wells calculated emissions for the 2nd, 3rd, and 4th quarters at, respectively, 1.4, 1.4, and 0.41 pCi/m3. *Id.* Hence, the minimum annual average for 1968 was *ten times* higher than permitted! ((1.4 + 1.4 + .41 + 0)/4 = 0.80 pCi/m3). Even for 1971, for which Dr. Wells provides only one quarterly emissions estimate, the annual average still exceeded the regulatory

3

limit of 0.08 pCi/m3 for thorium: (0.41 + 0 + 0 +0)/4 = 0.10 pCi/m3). *Id.* In other words, in early 1971 Cotter pumped so much thorium-230 offsite that it exceeded the annual limitations for the entire year by March!

Respectfully, the Court should reconsider its ruling that it "will exclude Wells's opinions that concentrations of contaminants at Latty Avenue exceeded the federal limit set forth in 10 C.F.R. § 20.106 (1960)," and allow him to offer these opinions to the jury. As such, Plaintiffs' will have admissible evidence if the Court continues to hold that the limitations found in 10 C.F.R. §20.106, on an annual basis, sets the standard of care, and summary judgment is not warranted.

**IV.    Even if Dr. Wells' calculations showing Cotter's violation of 10 C.F.R. § 20.106 on an annual average remain excluded, summary judgment is still not warranted because that section does not set the standard of care.**

Cotter's radioactive waste did not fall under the authority of the AEC, or the limitations in 10 C.F.R. § 20.106 until Congress passed the Uranium Mill Tailings Radiation Control Act of 1978 ("UMTRCA"). Before that, wastes produced by the extraction of uranium were not defined as "byproduct material" and therefore not regulated by the federal government. *Id.* But the UMTRCA changed that, expanding the definition to include "the tailings *or wastes* produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." *Id.*, at 92 STAT. 3033 (emphasis added). *See also,* Rosenberg, Ronald H., "Uranium Mining and Milling in Virginia: An Analysis of Regulatory Choice" (1984). Faculty Publications Paper 678, at 99. Available at: http://scholarship.law.wm.edu/facpubs/678 ("by extending the definition of 'byproduct material' to include 'the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content,' Congress extended the NRC's authority to the regulation of ***wastes produced with source material***") (emphasis added). The next year, the Nuclear Regulatory Commission

4

(NRC) amended the licensing requirements found in 10 C.F.R. Part 40 to cover uranium waste. Specifically, it added "byproduct material" to the definitions found under 10 C.F.R. § 40.4 as meaning "tailings or wastes produced by the extraction or concentration of uranium." *Id.* Prior to 1978, no federal licenses governing this material were available.

Cotter's license certainly does not govern this material, as it governs only Cotter's conduct with respect to "source" material. Congress defines "source material" as "(1) uranium, thorium, or any other material which is determined by the Commission . . . to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time." 42 U.S. C. § 2014(z). That's not what Cotter had at Latty Avenue. At Latty Avenue, Cotter had "Uranium processing residues and wastes resulting from [] ore-processing activities." PSOF No. 23. Hence, it falls under the definition of "byproduct material" ("***wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content***") which Congress first granted the AEC the authority to regulate in 1978. At the time of the acts complained of here, it fell outside the scope of federal regulatory authority, thus any federal standards could not, and did not, apply.

And so, even though the Price Anderson Act ("PAA") applies to grant federal jurisdiction, there is no federal standard of care. The PAA does not set the standard of care and instead provides that "the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." 42 U.S.C. § 2014(hh). With no federal standards applying to the waste at issue in this case, there is nothing for Missouri law to be inconsistent with. Hence, the standard of care is derived from Missouri law. And in Missouri, Defendants who cause radiation damage are subject

to strict liability. *Bennett v. Mallinckrodt, Inc.,* 698 S.W.2d 854, 867 (Mo. Ct. App. 1985). These are strict liability cases.

**V.   Because each Plaintiff only needs to produce evidence sufficient for a reasonable person to find he or she was exposed to levels that probably caused his or her cancer, summary judgment is not warranted on any common issue. [1]**

This Court ordered that it is to rule only on "motions for summary judgment or motions for judgment on the pleadings with respect to *common issues*." (ECF No. 78) (emphasis added). Hence, only the District Judge to whom these cases were originally assigned can rule on individual issues. *See, McClurg*, ECF No. 980. The common issue that relates to specific causation is whether or not it is possible for Plaintiffs to make a submissible case without Dr. Clark's expert report and Dr. Hu's opinions "ruling-in" Defendants as the cause of Plaintiffs' cancers based on Dr. Clark's report. It is. As explained below, the exclusion of this evidence is not dispositive. Instead, Missouri and Eighth Circuit law allows that a reasonable jury can infer exposure at levels significant enough to activate disease by weighing the individual exposure evidence unique to each Plaintiff, and summary judgment as to a common causation issue is not warranted.

In Missouri all that is necessary is "only 'evidence from which a reasonable person could conclude' that [plaintiff's] exposure probably caused her injuries.'" *Bednar v. Bassett Furniture Mfg. Co.,* 147 F.3d 737, 740 (8th Cir.1998) (quoting *Wright v. Willamette Indus., Inc*., 91 F.3d 1105, 1107 (8th Cir. 1996)). There is no requirement that this evidence come in the form of expert testimony, just as there is no requirement that it come in the form of mathematical tables. In *Kirk v. Schaeffler Grp. USA, Inc*., 887 F.3d 376, 390-91 (8th Cir. 2018), for instance, there was no dose reconstruction or opinions "ruling-in" the toxin as a cause based on a reconstruction, instead only evidence of "extensive TCE contamination in the Silver Creek community and the many ways

---

[1] Plaintiffs have further briefed this issue in their Opposition to Defendant Cotter's Motion for Summary Judgment, filed concurrently herewith, which Plaintiffs incorporates by reference.

[plaintiff] was exposed to that contamination for many years" was sufficient to present a submissble case. In *Bednar*, evidence of exposure consisted of measurements of the gaseous formaldehyde emitting from defendant's dresser taken well after the exposure occurred. *Bednar*, at 740. And though it was "impossible to recreate the exact conditions" of plaintiff's exposure, these measurements "exceeded recommended exposure levels" and therefore were adequate evidence standing alone to provide a "sufficient basis from which the trier of fact could infer that the [plaintiff's] exposure to gaseous formaldehyde exceeded safe levels." *Id.*

Here, like *Bednar* and *Kirk*, there is admissible evidence of extensive testing and measurements. This evidence comes directly from the multiple government reports on this matter, which are all admissible on their own, even if the Court does not allow Dr. Hu to testify about his review of them in forming his general causation opinions. Fed. R. Evid. 803(8) provides a hearsay exception for "A record or statement of a public office if it sets out …. factual findings from a legally authorized investigation; and the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Here, there is no doubt that the reports from the ATSDR, MDHHS, and other government agencies contain factual findings from legally authorized investigations. And Defendants present no evidence they lack trustworthiness.

These reports can be coupled with the evidence of how each one of these Plaintiffs individually were exposed to these dangerous levels of radiation in and around the creek. *See,* PSOF No. 63-75, 88-107, 120-125, and 139-145. This evidence of levels of radiation well above background levels and remedial goals, both in "hot spots" and other areas along the creek, combined with sufficient Plaintiff-specific evidence[2] of their exposure at these "hot spots" and

---

[2] Again, though each Plaintiff believes he or she has produced sufficient such evidence of their individual exposure in this manner, this is not a common question but instead an individual question to be resolved only upon transfer back to the district judge who was originally assigned each Plaintiff's case. Should this Court decide to rule on this individual issue, Plaintiffs request a chance to submit additional statement of facts and briefing.

other areas, is sufficient to allow a reasonable person can find that a particular Plaintiff's exposures probably caused his or her injury.

**VI.    There is no "background plus background" relevance test; not in Missouri, not in the Eighth Circuit, not even in the *TMI* cases Defendants rely on.**

Neither Missouri nor the Eighth Circuit employ a "background plus background" test for causation. All a plaintiff must do is make a submissble case on causation is show they were exposed to enough of a substance to cause their disease, and that their disease is consistent with their exposure. "In a toxic tort case, the plaintiff's burden includes proof of 'an exposure to an identified harmful substance significant enough to activate disease[,] ... expert opinion that the disease found in plaintiff is consistent with exposure to the harmful substance[, and proof that] defendant was responsible for the etiologic agent of the disease diagnosed in plaintiff.'" *Kirk v. Schaeffler Grp. USA, Inc.,* 887 F.3d 376, 390 (8th Cir. 2018) (citing *Elam v. Alcolac, Inc.,* 765 S.W.2d 42, 173 (Mo. App. 1988)).

Missouri courts have never required plaintiffs to produce statistical modeling or mathematical formulas to prove the "significant enough to activate disease" element. Nor is there any requirement that a plaintiff's exposure double background exposure before it can be deemed "significant enough." To the extent the Pennsylvania cases Defendants rely on require a higher burden, they are not applicable here because Missouri substantive law controls. But even those cases do not require Plaintiffs to prove exposure to "background plus background" before they make a submissible case. *In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999); *McMunn v. Babcock & Wilcox Power Generation Group, Inc.*, 131 F. Supp. 3d 352 (W.D. Penn. 2015). Instead, a plaintiff must simply show they were exposed to defendants' radiation *in addition to* background exposures, thus putting their *total combined exposure* above background levels.

8

Both *TMI* and *McMunn* rely on *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829 (3d Cir.1990). In *Paoli,* the Third Circuit reversed summary judgment entered for defendants, holding Plaintiffs made a submissible case that they had been exposed to PCBs above background level. *Paoli*, 916 F.2d 861. There, the evidence of background took the form of parts per billion (ppb) of PCBs as measured in the bloodstream. *Id.* While defendants claimed natural background was 40 ppb, plaintiffs claimed it was below 3 ppb. *Id.* Plaintiffs claimed only 10% of the population has a natural background of 5ppb, and anything greater than that should be considered high. *Id.,* n.9. The district court adopted a natural background of 4.2 ppb to 6.4 ppb, levels which a number of plaintiffs were above, though not by a factor of two. Based on this evidence, the Third Circuit held a "jury could believe plaintiffs' evidence regarding normal PCB background levels and from there could conclude that these plaintiffs were exposed to a *larger than average dose* of PCBs." *Id.,* at 862. There was no requirement that the plaintiffs' total exposure be twice the average (i.e., background) dose. Only that it be larger, in total, than the average person—exactly what Plaintiffs present evidence of here. As explained above, the evidence allows the conclusion that Defendants exposed Plaintiffs to radiation that, when combined with their background exposures, put them at a total "larger than average dose." Dr. Hu rules out every other cause of their cancers. They each have a submissible case.

*McMunn* confirms this is the standard, holding that the plaintiffs there needed to show they were exposed, on top of natural background, to the specific uranium from defendant's operation. That court explained that the holding in *TMI* does not require a plaintiff to prove exposure to a threshold level of radiation, "but that they were exposed to the radiation that they claim caused their injuries. That is, in this case, Plaintiffs still must demonstrate that they were exposed to 'this radiation,' that is, inhaled uranium from the Apollo plant in excess of normal background radiation

9

amounts[3]. Otherwise, they cannot demonstrate causation." *McMunn,* 131 F. Supp. 3d 552. Because plaintiffs had no evidence that they were exposed to the inhaled uranium from the Apollo plant at any level at all, they could not make a submissible case.

Here, even without Dr. Clark's opinions, each Plaintiff believes he or she can present ample evidence of exposure to Defendants' radiation that pushed their radiation exposure well over background levels. The 2019 ATSDR Report sets the background for thorium in soil at 1-3 pCi/m3 and then chronicles the thousands of measurements above this background level. PSOF No. 28-56. Some of these measurements exceed background level by up to 30 times. *Id.,* 43. The ATSDR Report even goes so far as to identify entire areas in and around the creek that are radioactive "hot spots" because of how far above background the soil and sediment samples are. *Id.,* 44. And Dr. Wells' quarterly calculations show that, at best, Cotter was exceeding 10 C.F.R. §20.106's limitations on an annual average basis by a factor of ten. *Id.,* 15-16.

The amount of time each Plaintiff spent in these areas being exposed to these unacceptable levels of radiation is not a common issue, but each Plaintiff has more than enough evidence of it. Take, for example, Mr. Hines who testified that from 1969-1974 he regularly played in the creek near Latty Avenue. PSOF Nos. 88-107. Not only that, but he also had a clubhouse at the end of Latty Avenue that he played in almost every time he visited the creek during these years. *Id.* He was 7 to 12 years old during this time. Not only does this put him at a spot in the creek almost directly adjacent to where the radioactive waste entered the creek, but it puts him right next to Latty Avenue, as a young child, during the exact same time the levels of thorium in the air were more than ten times the annual limits. *Id.* The jury will hear expert testimony that exposure to this radiation can cause his cancer. And it will also hear that other causes of his cancer have been ruled

---

[3] Again, as is clear from *Paoli* "in excess of normal background" does not mean background plus background, it simply means exposure to defendant's radiation resulted in an *overall exposure* that exceeded background levels.

10

out. Viewing his individual exposure evidence and the expert testimony in the light most favorable to him, a rational trier of fact can conclude "that [his] exposure probably caused [his] injuries.' " *Bednar*, 740.

At the very least, summary judgment as it relates to Mr. Hines turns on an individual issue and not a common issue, and is therefore not warranted at this time. The same is true for the other three Plaintiffs. Each will rise or fall on the exposure evidence specific to him or her individually. Defendants fail to establish that summary judgment on a common issue is warranted.

**VII.     Now that the order to consolidate has been vacated, the Court should reconsider its exclusion of Dr. Clark and Dr. Hu's testimony, and instead grant leave to amend their reports.**

The Court entered Case Management Order No. 14 "in light of" a Master Settlement Agreement between Cotter, Mallinckrodt, and every other plaintiff except these four. This order required all Plaintiffs not a party to the Settlement Agreement (i.e., these four and these four alone) to prepare and produce full expert reports from every known testifying expert within 60 days. But, as explained by Dr. Clark during his deposition, the Master Settlement Agreement prevented these testifying experts from relying on exposure analysis that "took multiple years" to complete. And so, the Master Settlement Agreement and Case Management Order No. 14, when taken together, had the unintended consequence of unduly prejudicing these four Plaintiffs, denying them a fair opportunity at discovery, and penalizing them for exercising their fundamental right to freely choose their own counsel.

Plaintiff raised these objections at the time these cases were consolidated, and raise them again now. Respectfully, these four Plaintiffs should not be treated differently from all past and future litigants. Now that the Court has held that the only methodology that Dr. Clark could employ timely enough to estimate dose within 60 days is inadmissible because it was "created for this

11

litigation," the Court should allow these four Plaintiffs the same right all other litigants now have—enough time to compose expert reports based on methodologies which will satisfy this Court's *Daubert* standards. Plaintiffs respectfully request leave to file amended expert reports.

Leave is especially appropriate now that, on April 22, 2022, because these four cases remained the only cases subject to the consolidation order the Court vacated that order, holding "it would no longer achieve efficiency" to consolidate these claims. ECF No. 111. And so, Case Management Order that was necessary to control "this mass tort litigation," in which "hundreds of plaintiffs" that have been filing claims, ended up applying to only four plaintiffs. Time will tell if any more plaintiffs file claims, but if they do, they will not be subject to the 60-day time limit to produce complete expert reports from all testifying experts. Respectfully, these four Plaintiffs should not be treated differently from all past and future litigants and should be granted leave to amend their expert reports.

We know that Missourians living near Cold Water Creek are at increased risk of developing cancer. For example, in the case of Pamela Butler, in 2014, the DHSS studied the issue and concluded that there is a significant increase in breast, colon, prostate, kidney, and bladder cancers in the area. PSOF Nos. 51-56. Ms. Butler lived in the area for a decade, visited the creek and the field where radioactive waste at levels far above background was found, and now has breast cancer. *Id.,* 63-76. Dr. Hu offers admissible opinions on breast cancer, as well as admissible opinions ruling out alternative causes of Ms. Butler's cancer. To the extent the Court rules she still does not make a submissible case because Dr. Clark's methodology was created for this litigation, she deserves the same as all other future litigants—enough time to allow her expert to use a methodology that is not created for litigation. As another example, as it relates to Emery Walick, the DHSS concluded that there is a significant increase in brain cancer among children. PSOF No.

56. Growing up in the area, Mr. Walick played in the creek beginning when he was very young, and was diagnosed with brain cancer when he was just 24. PSOF No. 120-126. Again, this Court held Dr. Hu's general causation opinions about Mr. Walick's cancer, as well as his opinions ruling out alternative causes of Mr. Walick's cancer, are reliable and admissible. Again, he deserves the same chance to work up his case as any other future litigant. The other two Plaintiffs, Anthony Hines and Ken Koterba also have their own evidence of exposure to couple with Dr. Hu's admissible opinions, and also deserve the same.

Instead, ten days after Ms. Butler, Mr. Walick, Mr. Hines, and Mr. Koterba filed their suits, the Court issued an order requiring them to produce "a case-specific expert report fully complying with Federal Rule of Civil Procedure 26(a)(2)" on ten different topics "for all known expert witnesses who will be providing such testimony" within 60 days. PSOF No. 172. This included the organ dose and whole-body effective committed dose attributable to each Defendant, as well as general and specific causation for each Plaintiff. *Id.* Their toxicologist, Dr. Clark, went to work using the only tools available to him to accomplish such a herculean task in such a short amount of time—the years and nature of Plaintiffs' exposures, and the ATSDR's simplified analysis. PSOF No. 183-194. He had to use this methodology because he was unable to benefit from the years of discovery the other plaintiffs received before having to produce their expert reports, as the Master Settlement prohibited the use of, or even access to, the analysis of other plaintiff experts. *Id.* In contrast, Defendants' experts were afforded over three years to review almost 100,000 pages of material, and generate 689 pages of invoices totaling over $2.1 Million. PSOF Nos. 195-196.

The Court set these strict deadlines to ensure "any new cases will flow as smoothly and efficiently as possible. Accordingly, the Court expects strict adherence to them." *McClurg* ECF No. 741, at 11. But the Court also required Defendants to notify any Plaintiff it believes has failed

13

to "fully comply with the requirements of this Order." *Id.* Defendants never notified Plaintiffs they believed Plaintiffs failed to fully comply with the Order by failing to provide "adequate expert report(s)." *Id.* When Plaintiffs pointed this out, claiming they should have been given notice and an opportunity to cure before Defendants could argue that Plaintiffs' "case-specific expert report fully complying with Federal Rule of Civil Procedure 26(a)(2)" were not adequate, the Court dismissed their argument. *Id.,* at 10. The Court ruled that "[t]he notice-and-cure procedures in CMO No. 14 relate to failures to comply with the CMO's early disclosure requirements, not to *Daubert* arguments challenging particular expert opinions." ECF No. 104, p. 6, n.3.

But it was not unreasonable for Plaintiffs to interpret the order otherwise and they should not be denied the same opportunities as all other past and future litigants for doing so. Why require Plaintiffs to produce *complete* expert reports *fully complying* with the Federal Rules from *all know experts* in the name of efficiency if Defendants can sit back for years before challenging these reports? Respectfully, such an interpretation of the Court's order does not necessarily guard against "wasteful pretrial activities." *McClurg* ECF No. 741 at 1. Nor does it avoid unnecessary "detailed and expansive discovery." *Id.,* at 2. Rather than penalizing Plaintiffs for holding a different interpretation of the Court's Order, Plaintiffs should be allowed leave to amend their expert reports so that they can be on the same footing as every other litigant, past, present, or future, in this matter. Now that we know, in hindsight, that this is no longer a mass tort and has not been since the day these Plaintiffs' filed their case, nothing justifies treating them differently. Plaintiffs respectfully request leave to serve amended expert reports.

## VIII. Conclusion

Plaintiffs have the evidence necessary to make a submissible case even after the Court's *Daubert* order. To the extent the Court believes otherwise, justice requires they be allowed leave to serve supplemental expert reports so they can have the exact same opportunity to have their claims decided on the merits as every other litigant has received in the past, and will receive going forward.

WHEREFORE for the reasons stated above, Plaintiffs respectfully request the Court deny Defendant Cotter's Motion for Summary Judgment on common issues or, in the alternative, to stay its ruling on the Motion and grant Plaintiffs leave to serve amended expert reports.

Respectfully Submitted,

HUMPHREY, FARRINGTON & McCLAIN, P.C.

*/s/ Jonathan Soper*
Kenneth B. McClain     #32430
Jonathan M. Soper      #61204
Colin W. McClain       #64012
221 West Lexington, Suite 400
Independence, MO 64050
Telephone: (816) 836-5050
Facsimile: (816) 836-8966
kbm@hfmlegal.com
jms@hfmlegal.com
cwm@hfmlegal.com
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of June, 2022, I electronically filed the above with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

*/s/ Jonathan Soper*